HERVEY H. DORR *et al.*

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed June 19, 1907.*

1. CONFIDENCE GAME—*what is not sufficient to justify a conviction.* To justify a conviction under an indictment for the confidence game it is not sufficient to prove the defendant guilty of such acts and fraudulent practices, only, as would subject him to liability in a civil action or to prosecution under some other provision of the Criminal Code.

2. SAME—*what evidence does not sustain conviction for confidence game.* Conviction for the confidence game is not sustained by proof that the accused was the manager of a corporation conducting a legitimate business, and that the complaining witness, after investigating the business, bought stock in the corporation and became a district manager under a written contract providing that if he resigned he should co-operate with the corporation to sell his stock to some one else, even though it is proven that he was unable to make the business pay, and that the accused refused to keep his verbal promise to take back the stock and return the money if the venture was not successful.

HAND, C. J., and VICKERS and CARTWRIGHT, JJ., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

Hervey H. Dorr and L. H. Sawyer were indicted for obtaining from Gustave Kitzeman, by means of the confidence game, a cashier's check for $500. A second count charged the check was obtained by false pretenses. A *nolle prosequi* was entered by the State's attorney as to said second count. A trial upon the first count resulted in a verdict of guilty, upon which, after overruling a motion for a new trial and a motion in arrest of judgment, the court pronounced judgment and sentenced the plaintiffs in error to the State penitentiary.

The evidence shows that about the year 1896 plaintiff in error Dorr originated and established a method of col-

lecting debts by means of a series of letters which he furnished to business firms, to be mailed by such firms to their debtors. These letters purported to be sent by the "Merchants' Credit Guide Company." The system, in brief, was as follows: A merchant or manufacturer or other person doing a credit business would subscribe to the "Dorr system" and would pay a given sum for the privilege of using the system for one year. Such subscriber was then furnished with a supply of letters printed in typewriter type on the letter-head of the Merchants' Credit Guide Company. These letters were in a series and were four in number. The subscriber could use his own judgment as to the order in which he would send out these letters. They were so worded as to indicate that the Merchants' Credit Guide Company was writing them and that the information called for was for the purpose of enabling it to make a report. If a reply was made it would go to the Merchants' Credit Guide Company, and Dorr would then re-mail the reply to the creditor. The company known as the Merchants' Credit Guide Company was incorporated in 1899 with a capital of $2500. Seven hundred dollars was paid by two parties, who, after remaining in about six months, went out and the $700 was paid back to them. In March, 1900, plaintiff in error Sawyer bought $500 worth of the stock and was made secretary of the company. The balance of the stock was held by plaintiff in error Dorr, his wife and his brother. Dorr was president of the company. In April, 1902, the capital stock of the company was increased to $25,000, and in September, 1903, it was increased to $250,000. No money appears to have been paid in by Dorr or any one else, except the $500 paid by Sawyer, until the alleged sales hereinafter stated. Plaintiff in error Dorr testified that the capital stock was increased and the stock was issued on the value of the Dorr system of collecting debts. It appears that Dorr had copyrighted the letters which were used by subscribers, and the capital stock of the company represented, in the estimation

of Dorr, the value of his system and his copyrights. After the capital stock had been increased to $25,000 the corporation adopted the system of employing district managers and assigning them certain territory. Said district managers were required to buy stock in the corporation at par, and the contract of employment provided that the expenses of their respective territories should be, salary of the manager $150 per month, office rent not exceeding $25 per month, postage not exceeding $10 per month and commissions not exceeding $15 per month, all of which was to be paid from the receipts of the respective managers' territory. It was also provided in the contract that if the resignation of the district manager was tendered and accepted because the net income from the said manager's territory after a certain time (which in the Kitzeman case was three months after the date of the contract) should be less than $100 per month, he would co-operate with the corporation in endeavoring to secure a successor who would take up at the purchase price the stock held by him in the corporation. Gustave Kitzeman, the complaining witness, advertised for a position, stating that he had $500 to invest. Dorr answered the advertisement and Kitzeman went to his office, where he met both plaintiffs in error.

AYERS, RINAKER & AYERS, FRANK HAMLIN, and BROWNE & WILEY, for plaintiffs in error:

Where the constitution of the State provides that an indictment shall conclude "contrary to the peace and dignity of the People of the State of Illinois," an indictment which fails to so conclude is fatally defective and is a nullity. *Williams* v. *State*, 27 Wis. 402; Const. 1870, art. 6, sec. 33; *Parris* v. *People*, 76 Ill. 277; *Gould* v. *People*, 89 id. 217; *Whitesides* v. *People*, Breese, 21; *State* v. *Soule*, 20 Me. 19.

In all statutory offenses not known to the common law the indictment must conclude, "contrary to the form of the statute." *State* v. *Soule*, 20 Me. 19; *Commonwealth* v.

*Hoye,* 77 Mass. 462; *People* v. *Enoch,* 13 Wend. 159; *State* v. *Jim,* 3 Murph. 3; *Warner* v. *Commonwealth,* 1 Pa. St. 154; *Commonwealth* v. *Stockbridge,* 11 Mass. 279; *Chapman* v. *Commonwealth,* 5 Whart. 427; *State* v. *Wilbor,* 1 R. I. 199; *State* v. *Soragan,* 40 Vt. 450; *State* v. *Cadle,* 19 Ark. 613; *State* v. *Gove,* 34 N. H. 510.

The fact that one count in an indictment, upon which a conviction has not been predicated, has the proper conclusion, does not in any way cure or help the count upon which the conviction was predicated solely, and which does not conclude as required by law. Especially is this true where the only count which has the conclusion is voluntarily dismissed out of the indictment and out of court by the State. Each count, as to the material charging elements, must be complete and perfect in itself. *Williams* v. *State,* 47 Ark. 230; *State* v. *Hazle,* 20 id. 156; *State* v. *Cadle,* 19 id. 613; *State* v. *Clevenger,* 25 Mo. App. 655; *State* v. *Pemberton,* 30 Mo. 376; *Early* v. *Commonwealth,* 86 Va. 921; *Commonwealth* v. *Carney,* 4 Gratt. 546; *Thompson* v. *Commonwealth,* 20 id. 724; *State* v. *McClung,* 35 W. Va. 280; *State* v. *Strickland,* 10 S. C. 191.

Proof of the commission of other alleged offenses, or evidence tending to prove the commission of other alleged offenses, is clearly inadmissible. *Towne* v. *People,* 89 Ill. App. 276; *Baker* v. *People,* 105 Ill. 452; *Kribs* v. *People,* 82 id. 425; *Parkinson* v. *People,* 135 id. 401; *Jackson* v. *People,* 126 id. 139; *DuBois* v. *People,* 200 id. 157.

False representations, in order to constitute the basis of a prosecution for the confidence game and to sustain a conviction, must be shown to have been the operative cause. 2 Wharton on Crim. Law, pars. 2120-2123.

Even though the false pretense be made with fraudulent intent and the person defrauded part with his property, the offense is not complete except the property has been parted with upon and under the inducement of the false pretense. 7 Am. & Eng. Ency. of Law, (1st ed.) 708.

To sustain a prosecution for obtaining goods under false pretenses, it must, in legal effect, be charged in the indictment, as well as proved at the trial, that the goods were obtained by means of the alleged false pretenses. *People* v. *McAllister,* 49 Mich. 12; *State* v. *Connor,* 110 Ind. 469.

False representations, or anything claimed to be representations, in order to be "false pretenses" within the meaning of the law, must be the direct cause of the loss of the thing of value,—must be the moving cause and not the cause of the cause,—must be the proximate cause. *Pierce* v. *People,* 81 Ill. 98; *Commonwealth* v. *Drew,* 19 Pick. 184.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (FLETCHER DOBYNS, of counsel,) for the People:

The scheme to defraud disclosed by the record constitutes the confidence game. *Morton* v. *People,* 47 Ill. 468; *Maxwell* v. *People,* 158 id. 248; *VanEyck* v. *People,* 178 id. 199; *Graham* v. *People,* 181 id. 477; *DuBois* v. *People,* 200 id. 157; *State* v. *Terry,* 109 Mo. 60; *State* v. *Morgan,* 112 id. 205; *State* v. *Wilson,* 72 Minn. 522; *State* v. *Smith,* 82 id. 342.

It was not error to permit the State to introduce evidence of other offenses than the one charged in the indictment. *Thomas* v. *People,* 59 Ill. 160; *DuBois* v. *People,* 200 id. 157; *Dunn* v. *People,* 40 id. 465.

Mr. JUSTICE FARMER delivered the opinion of the court:

Notwithstanding the labor imposed by setting out in the abstract a great portion of the testimony in full by questions and answers instead of "a complete abstract or abridgment" of the testimony, we have read it carefully from the alleged abstract, and having reached the conclusion that the evidence is insufficient to sustain a conviction for the confidence game, it is unnecessary for us to discuss the numerous other errors assigned and argued in a brief of 227 pages on

behalf of plaintiffs in error and a brief of 106 pages on behalf of defendant in error.

It is not contended that the business of the Merchants' Credit Guide Company with its customers and subscribers, among whom were included a number of the largest and most reputable mercantile houses in Chicago and other cities, was an unlawful or illegitimate business. The evidence shows that Kitzeman, the prosecuting witness, advertised in the *Chicago Tribune,* some time in April, 1904, for a position, stating in the advertisement he had $500 to invest. Plaintiff in error Dorr saw the advertisement and wrote him a letter, which resulted in Kitzeman calling at the office of plaintiffs in error and the Merchants' Credit Guide Company about the latter part of the month of April. At this time an extended interview took place between Dorr and Kitzeman with reference to the character of the business of the Merchants' Credit Guide Company, the employment of Kitzeman as district manager and the territory he should operate in. No contract was entered into by the parties at this time nor was any made until there had been at least three, and probably four, more interviews between the parties. According to Kitzeman's testimony Dorr fully explained the character and methods of the Merchants' Credit Guide Company's business, gave him the names of a number of its subscribers in the city of Chicago and showed him some letters of endorsement from some of these subscribers. Among the subscribers referred to in the city of Chicago were such well known houses as Lyon & Healy, Franklin McVeagh, Humiston, Keeling & Co. and the Skinner Manufacturing Company. Kitzeman says he called on at least some of these firms before entering into the contract and inquired about the Merchants' Credit Guide Company and its business. He was not permitted to testify to what he was told by these houses, but it is reasonable to suppose that he did not receive an unfavorable report or he would not have afterwards accepted employment with said corpora-

tion. On May 5, which, as we understand the evidence, was the fourth interview between Kitzeman and Dorr, the latter exhibited to Kitzeman the form of the contract to be executed if Kitzeman accepted the position of district manager. The territory to be allotted Kitzeman was called the territory of north-eastern Ohio, embraced several counties in that section of the State and included the city of Cleveland. According to the testimony of Kitzeman he read the contract over carefully. Some of its provisions did not suit him, and at his suggestion and request certain modifications of it were made. After this was done the contract was signed by the parties and a $500 certified check turned over by Kitzeman to Dorr, for which he received twenty shares of stock in the Merchants' Credit Guide Company. Soon after, Kitzeman proceeded to Cleveland to enter upon the work of his position. The Merchants' Credit Guide Company paid his railroad fare to said city and also sent a representative to instruct Kitzeman in the business and assist him in getting a start. Kitzeman remained in Cleveland until September, 1904, and being unable to secure enough subscribers to the Merchants' Credit Guide Company to make the business a success, he quit the field and wrote to said company notifying it that he had quit its employment because he was unable to secure enough business to justify him in continuing in the work and requesting a return of the $500 paid for stock, which stock he offered to surrender back. Kitzeman was unable to do much business in the territory to which he was assigned, although he testified he labored hard and earnestly. During his employment, in addition to his car fare from Chicago to Cleveland, he received from the Merchants' Credit Guide Company $50 and remitted to said company $40. He retained and used $140 or $145. Plaintiffs in error, on behalf of their corporation, refused to return to him the $500, claiming that it was unlawful for the corporation to buy the stock back, and called attention to the fact that under the terms of the

contract they were under no obligation to return Kitzeman the money.

The only provision of the contract relating to the stock purchase was, that in case of the resignation of Kitzeman he would co-operate with the Merchants' Credit Guide Company in securing a successor who would take his stock at the same price he paid for it. This is not an agreement that the company would take the stock and pay back to Kitzeman the money he paid for it, nor is it claimed by the defendant in error that the written contract imposed any such obligation upon plaintiffs in error. Kitzeman does not claim he did not fully understand the contract when he signed it. He does testify, however, that Dorr verbally agreed to take the stock and give his money back if he should quit his employment, and this is the only respect in which Kitzeman claims to have been deceived or defrauded, except that he testified plaintiffs in error showed him a carbon copy of a report which they represented was from their district manager from Toledo, Ohio, which he said showed a profitable business. He testified he saw no name on the report. Plaintiffs in error both testified they had no report from the Toledo manager at that time, but that the report shown Kitzeman was from their St. Louis manager, which report they produced at the trial. Dorr denies he ever promised Kitzeman to take up his stock and pay him his money back, and it is not claimed that any such promise was ever made by Sawyer, who testifies no such proposition was ever made in his presence or hearing. If proof beyond a reasonable doubt that Dorr did make such verbal promise would be sufficient to establish his guilt of the confidence game, it would seem to be a grave question whether the fact was proven by that degree of evidence. If Kitzeman was corroborated at all, it was by Lawrie and Burnett. These two parties had been employed by plaintiffs in error under contracts similar to the one made with Kitzeman. The court permitted them to testify that when they made their

contracts they purchased stock of plaintiffs in error under a verbal agreement to buy it back if they quit the employment; that they did quit said employment and plaintiffs in error refused to take the stock back and refund the money. If this had been competent testimony, (which it is unnecessary here to determine,) it is still open to serious question whether, as against the denial of the plaintiffs in error, corroborated as they were by the written agreement with Kitzeman, the evidence of the prosecution was sufficient to justify a conviction. But however that may be, we are of opinion the proof in this case fails to show the guilt of plaintiffs in error of the crime charged in the indictment. The indictment charges them with obtaining the certified check by means and by use of the confidence game. It is not sufficient, under such an indictment, to prove the defendant guilty of such acts and fraudulent practices as would subject him to liability in a civil action or to indictment and prosecution under some other provision of the Criminal Code.

It is argued by counsel for defendant in error that the evidence shows the whole scheme and purpose of plaintiffs in error was to defraud any person whom they could induce to trust them. This is a misconception of the force and effect of the testimony. The proof shows that the business of the Merchants' Credit Guide Company was the collection of claims due their subscribers and ascertaining and reporting the financial condition of business men and others when so requested by their subscribers. That the methods employed by said company were not considered disreputable, fraudulent or unlawful is evidenced by the fact that the proof shows, as we have before said, their subscribers embraced a large number of the leading business concerns in Chicago and other cities. The proof further shows said company had about seven hundred subscribers. The subscription prices ranged from $25 up to $100 per year, and some of them had been renewed a number of times. The

business had been carried on in the same manner ever since 1896, and there is an utter absence of evidence that its object and purpose was to defraud. If the plaintiffs in error did, as contended, induce Kitzeman to pay $500 for stock in the corporation under a verbal agreement to return his money and take the stock back if he left their employment, when the written agreement signed by Kitzeman, and which he does not pretend he did not read carefully and understand, exempts plaintiffs in error from such duty, we think this insufficient to bring the act within the confidence game.

The cases of *Maxwell* v. *People*, 158 Ill. 248, *DuBois* v. *People*, 200 id. 157, *Hughes* v. *People*, 223 id. 417, and *Chilson* v. *People*, 224 id. 535, are essentially different in all their material facts from the case at bar. In those cases the parties convicted under indictments charging them with obtaining money by means of the confidence game were not engaged in any legitimate business having any connection with the acts which resulted in their indictment and conviction, but the only business in which the evidence shows the defendants in those cases were engaged was deceiving innocent and unsuspecting persons and obtaining money from them by devices and tricks that left no room for doubt as to the criminal character of the acts and were within the definition of the confidence game. In·this case it is not testified by Kitzeman that either of plaintiffs in error represented to him that the stock purchased would be a valuable investment on account of it paying dividends or of its probable future increase in value. Kitzeman testified Dorr told him the corporation was not selling stock, except a certain amount that had been set aside for persons employed as district managers, and that the purpose of selling this stock to·them was to insure them giving the business their best efforts. He says he does not remember whether Dorr said anything about dividends on the stock, while Dorr testifies he told him no dividends had ever been paid thereon. Kitzeman was an educated, intelligent man, had lived in Chicago

228—15

many years, and had had a very considerable experience in business affairs with and for important business concerns in said city. He believed the plan of the Merchants' Credit Guide Company was a good one and that employment by it would be profitable, but the evidence does not show this belief was induced by false representations of plaintiffs in error. In addition to Dorr explaining it fully to him, Kitzeman investigated it among the subscribers to the system. It is true that, apparently through no fault of Kitzeman or plaintiffs in error, he failed to make the business a success in the territory assigned to him, but there is an absence of evidence to show that he was induced to part with the certified check by acts intended to be embraced within the 98th section of the Criminal Code.

The judgment of the criminal court is therefore reversed and the cause remanded.          *Judgment reversed.*

VICKERS and CARTWRIGHT, JJ., and HAND, C. J., dissenting:

We do not concur in the opinion of the majority of the court in reversing this judgment on the ground that the verdict of the jury is not supported by the evidence. That there is no error in the rulings of the court on the motion to quash the indictment, the admission or rejection of evidence or the giving or refusing of instructions may be fairly assumed, since none is pointed out in the foregoing opinion of the court, and the judgment of reversal is based entirely on the want of sufficient evidence to support it. It is therefore unnecessary to discuss other questions that have been urged by plaintiffs in error as reasons why the judgment should be reversed. All these questions have been ignored and eliminated by the majority view and it is not our purpose to discuss them, but we respectfully dissent from the foregoing opinion of the majority of the court in holding that this judgment should be reversed and the cause remanded because the same is not supported by the evidence.

We fully recognize the right and the duty of this court to reverse and remand a criminal cause whenever it appears that the verdict of the jury is so contrary to the evidence as to impress the court with the belief that the verdict is the result of passion or prejudice; (*Graham* v. *People,* 115 Ill. 566; *Sanders* v. *People,* 124 id. 218;) but it has always been the rule of this court to use this power with great caution, and especially in cases where the record is otherwise free from error. In *Smith* v. *People,* 103 Ill. 82, on page 84, it was said: "The guilt or innocence of the accused is always a question for the jury, and their finding will seldom be disturbed, unless where it is manifest they have been misled by the instructions of the court to the prejudice of the defendant." We are impressed that the facts in the case at bar do not bring it within the rule which authorizes or requires this court to interfere with the conviction on the sole ground upon which the opinion of the court in this case is based.

In addition to the facts stated in the foregoing opinion of the court, in order to get a clear view of the exact character of the business in which plaintiffs in error were engaged, it is necessary to state some additional matters.

As already stated, plaintiffs in error were conducting a sort of collecting business, under the name of "The Merchants' Credit Guide Company." This concern was incorporated and purported to have a paid up capital of $250,000. In truth and in fact it did not have any capital, and the evidence shows conclusively that $500 was all the money that was ever paid into the treasury which was not drawn out by the persons who paid it in. What became of the $500 does not appear, but it is a fair inference that one or other, or both, of plaintiffs in error received the benefit of it. This so-called Merchants' Credit Guide Company had four stereotyped letters which were used by its subscribers in intimidating debtors to pay accounts due subscribers. Letter No. 1 in the record is, in part, as follows:

"[Name of Debtor.]

"Dear Sir—We have been requested by one of our subscribers to furnish a report concerning your financial responsibility and promptness in meeting your obligations. In the course of our investigations we incidentally learned that there is an account against you held by...........of........amounting to $...., which is past due. Will you please advise us by return mail why this account should not be paid, and whether you can arrange for a settlement with creditor by..........., at which time we are to file our report.

"We make this special inquiry of you direct, because we wish to avoid doing you an injustice in our report. As we have not found other delinquent accounts against you, we shall feel justified in furnishing a favorable report, provided you can arrange this matter satisfactorily.

"Please note that this account is not in our hands for collection, nor has the creditor written us or made any unfavorable report of you to our representative. We enclose addressed envelope for your reply.

       "Yours very truly,

       Merchants' Credit Guide Co."

Each subscriber was furnished a supply of letters, of which the foregoing is a copy of No. 1. They were also furnished with copies of letters numbered 2, 3 and 4, which were intended to be used to terrify the debtor and raise his apprehensions of a loss of credit unless he made a remittance, regardless of the reasons which caused the delay. It must be borne in mind that these letters were not sent out by the so-called Merchants' Credit Guide Company, but the subscriber bought the privilege of the plaintiffs in error of sending out these letters indiscriminately, whenever, in the judgment of such subscriber, it would aid in coercing the payment of some past due demand. The answer from the debtor would, of course, be sent to the Merchants' Credit Guide Company and would be by plaintiffs in error turned over to the subscriber who had sent it out. This, so far as the evidence shows, was the only duty performed by plaintiffs in error in connection with this scheme for collecting debts. These letters were copyrighted and constituted the capital of this corporation, which was increased from $2500 (the amount for which it was incorporated in 1899) to $250,000 in September, 1903. Aside from a slight increase

in the number of subscribers the corporation had no more assets after the capital was raised to $250,000 than it had when it was $2500. It was to all intents and purposes a mere paper corporation, doing business on the imaginary value of some copyrighted falsehoods contained in the so-called letters above referred to.

It is said in the opinion of the majority of the court: "The cases of *Maxwell* v. *People,* 158 Ill. 248, *DuBois* v. *People,* 200 id. 157, *Hughes* v. *People,* 223 id. 417, and *Chilson* v. *People,* 224 id. 535, are essentially different in all their material facts from the case at bar. In those cases the parties convicted under indictments charging them with obtaining money by means of the confidence game were not engaged in any legitimate business having any connection with the acts which resulted in their indictment and conviction, but the only business in which the evidence shows the defendants in those cases were engaged was deceiving innocent and unsuspecting persons, and obtaining money from them by devices and tricks that left no room for doubt as to the criminal character of the acts, and were within the definition of the confidence game."

With this statement these four previous decisions of this court are passed over, and no further attempt is made to distinguish them from the case at bar. We do not think that the case at bar can be distinguished from the three latest decisions of this court above cited. By implication, the majority opinion lends the certificate of legitimacy to the business in which plaintiffs in error were engaged. How it can be said that the business of plaintiffs in error is legitimate when it is built upon a tissue of falsehood and fraud, from the very inception of it until its final conclusion, is something that we cannot comprehend. Take the letter that is set out above for example, and it is a brazen falsehood in every sentence and in every line of it, and is a fraud upon the debtor which no reputable business man would want to perpetrate upon his customer unless he never expected to have

any interest in him beyond the collection of the amount that then might be due. The debtor who receives such a letter will be deceived. First, it is a deception as to the sender of the letter. It appears to come from the Merchants' Credit Guide Company when in truth it is sent by the person claiming the demand against him, and the body of the letter is filled with false representation, and is sent with the manifest purpose of intimidating the debtor into the payment of the demand, whether just or unjust, to avoid the execution of the ill-concealed threat to make an unfavorable report upon his credit. The letter purports to be sent out of a tender regard for the debtor, "because we wish to avoid doing you an injustice in our report," when the real purpose is to coerce the payment of the bill. The truth is, that the Merchants' Credit Guide Company has received no inquiry concerning the recipient of this communication, and will have no occasion to make any report, favorable or unfavorable, with respect to his financial standing. Still, the letter advises the debtor that "we shall feel justified in furnishing a favorable report, provided you can arrange this matter satisfactorily." A business that requires a resort to such subterfuges and deception as plaintiffs in error were guilty of can hardly be said to be a "legitimate business." To pay one's just debts is a duty that every citizen owes, and creditors have a right to proceed by all lawful means, in or out of court, for the purpose of collecting amounts justly due; but the law draws a line of distinction between methods which are proper and lawful and those which are unlawful and improper, permitting the use of the former and denying the employment of the latter. Because the end sought to be accomplished is lawful it must not be assumed that any means that ingenuity can devise to accomplish that end are therefore legal.

But if it be granted that the relations of plaintiffs in error with their subscribers, and through the subscribers with their debtors, is not absolutely illegal as being in vio-

lation of any statute of the State or rule of the common law, still in the relations of plaintiffs in error to their managing agents who were induced to buy worthless stock in this concern, their conduct seems to us to come clearly within the definition of "confidence game," as defined by this court in the cases above cited. The transaction in question with the complaining witness, Kitzeman, was a swindling operation, in which advantage was taken of the confidence reposed by the prosecuting witness in the plaintiffs in error,—a confidence that had been obtained by deceit and false pretenses,—which brings the case clearly within the rule laid down in *DuBois* v. *People, supra, Hughes* v. *People supra,* and *Chilson* v. *People, supra.* In the *Chilson case,* on page 539, this court said: "Where a contract, apparently legal, is entered into by one party with the intention of taking no steps to carry it out but with the wrongful intent of causing the other to part with his money without receiving any adequate consideration therefor, such contract may, and in this case did, become a mere incident of the 'false and fraudulent scheme.' The ordinary case of agreeing to sell the gullible one a gold-brick now in the possession of the aged Indian presents a breach of a contract, and yet counsel would scarcely pretend that it is for that reason any the less a confidence game. The fact that the affair was made to assume the guise of an ordinary business transaction, whereby, as a preliminary, Spooner was required to pay his money for the lots, is without significance. It is the substance, and not the form, that is material."

The language of the above quotation is applicable to the facts of the case in hand, where plaintiffs in error went through the form of employing Kitzeman and of selling him a block of stock in the so-called Merchants' Credit Guide Company. That this stock was utterly worthless is shown beyond all reasonable doubt. The stock was sold by means of false and fraudulent representations, if the evidence of

Kitzeman and the witnesses other than the plaintiffs in error is to be believed. Plaintiffs in error were co-operating together for the purpose of getting the money of the complaining witness for this stock. That was the substance of the whole transaction. While, in form, it assumed the guise of a pretended employment of the complaining witness as a so-called managing agent in certain territory, yet no one can read this record and have any doubt remaining that the great concern of plaintiffs in error was to defraud the complaining witness out of a sum of money for the pretended sale of stock that was not worth the paper upon which it was printed.

It is said in the opinion, and in the record by plaintiffs in error, that they were doing an extensive business and had some seven hundred subscribers on their list; but it is to be noted that in every instance where plaintiffs in error employed a managing agent and induced him to buy a block of this stock it resulted in completely defrauding the party out of all the money that he paid to plaintiffs in error. Not a single managing agent is called in from the field to testify that he was not defrauded by the plaintiffs in error out of all the money that he had paid them. On the contrary, two others besides the complaining witness lost $1000 and $1500, respectively, in the same so-called "legitimate business" in which the plaintiffs in error were engaged. In short, speaking from the standpoint of this record, the plaintiffs in error swindled and defrauded every person to whom this stock was sold, out of the entire amount that he paid for it. If this is not confidence game, then in our judgment there are several persons in the penitentiary in this State for that offense who ought to be liberated.

We are of the opinion that the judgment ought to be affirmed.