(No. 20732.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRED MILLER, Plaintiff in Error.

*Opinion filed June 18, 1931.*

JOSEPH A. WEIL, and ALBERT J. WEIL, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, HENRY E. PRATT, State's Attorney, and MERRILL F. WEHMHOFF, for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, Fred Miller, was found guilty and sentenced to the penitentiary by the circuit court of Peoria county upon an indictment charging him and J. E. Camplin with obtaining a check for $1050 from Samuel McKinney by means of the confidence game. He brings the record here for review on writ of error.

In October, 1928, Fred Miller, with J. E. Camplin, J. N. Horn and H. L. Duell, started the formation of two separate corporations in the city of Peoria, and in November, 1928, articles of incorporation were issued to the Peoria Breeding Company, of which the original incorporators were

Miller, Camplin and Freda Sweitzer. At the same time articles of incorporation were issued to the Peoria Fur Farms, Inc., the original incorporators of which were Duell, Horn and Camplin. The business of the Peoria Breeding Company was selling domesticated muskrats on contract to the public at prices in the neighborhood of $175 per pair. The purchasers of the rats then entered into a general ranching service contract with the Peoria Fur Farms, wherein the latter agreed to ranch, feed and generally take care of the rats purchased by the public, on its farm near the city of Peoria, and also take care of the progeny of all rats which were to be sold or pelted by the Peoria Fur Farms and the receipts therefrom divided between the purchaser of the rats and the Peoria Fur Farms, each sharing equally after the deduction of a certain commission to the Central National Bank and Trust Company of Peoria, as trustee. The trustee was to be furnished with an invoice showing the number of rats sold, to whom they were sold and the amount of money paid. The bank was then to make distribution in accordance with the agreement with the Peoria Fur Farms.

The Peoria Fur Farms had a tract of forty-five acres of land near Peoria and started operations in November, 1928. About 1000 pens for the rats were built in sections of six. The pens were numbered and a record was kept of the section and pen numbers and the owners of the rats therein. Between three and four thousand rats were obtained from time to time, many of which died, but when any of the rats died they were replaced by others. Four or five men were employed to take care of the farm and the rats. When young rats were born, invoice slips showing the section and pen number and number of muskrats born were given to the Central National Bank and Trust Company, trustee, and the invoice slips showed the initials of the persons by whom they were checked. About $2500 in the form of checks was received by the bank from the

Peoria Fur Farms and the Peoria Breeding Company for the sale of young rats, and distribution of this money was made to approximately fifty people over a period from January 7, 1929, to November 13, 1929. The bank kept a list of the persons to whom the money was sent and the date of sending. Before making distribution upon the invoices the bank caused them to be O. K.'d by an accountant associated with a firm of certified public accountants, which was his certificate to the bank, before it would pay the same, that they were correct and that the things therein stated were first ascertained, checked up and certified to by a public accountant. Two of the persons employed upon the farm testified that to their knowledge only two litters of rats were born. One of these witnesses certified to invoices to the bank of a great many more, and none of the other employees or persons certifying to the invoices were called to testify upon this subject. After the organization of the company an intensive campaign to secure sales contracts was inaugurated by means of newspaper and magazine advertising, letters from other fur farms and persons supposed to have knowledge upon the subject, government reports showing the fecundity of muskrats, and the personal solicitation of various salesmen for the company. The advertisements and representations of the salesmen made glowing predictions as to the amount of money that could be made by the investor within a few years by reason of the sale of the pelts from muskrats purchased and from their progeny. In all about 175 sales contracts were entered into and rats transferred to pens assigned to the purchasers. The novelty of the business and widespread advertisement caused thousands of people to visit and inspect the farm and muskrats. The farm was in operation at the time of the trial.

McKinney first met Miller in January, 1929, at which time Miller was introduced to him by a Peoria business man. Miller went to McKinney's office and solicited him to enter

into a contract for the purchase of some rats and gave the names of several prominent Peoria people as reference. McKinney testified that he asked Miller what kind of rats he was buying, and was told "absolutely domestic rats" bred and born in pens; that he was interested in the breeding farm they were getting them from; that Miller explained how rats multiplied and how many thousands they were going to be worth after three years; that witness questioned him closely about pen-raised rats, because he had been raised on a farm and tried to raise them and never could after they were taken from the wilds; that Miller guaranteed that he was selling nothing but rats that he could guarantee were domestic and that they would live and breed. At the first visit no sale was made and a few days later Miller again called upon McKinney, at which time McKinney told him that he would make an investigation of the concern, which he did by conferring with officers of the Central National Bank at Peoria, an attorney at law, a contractor, and several other prominent business men of the city of Peoria, and on January 17, 1929, after he had made this investigation, he purchased twelve muskrats and a ranching service contract with the Peoria Fur Farms for $1050, and on March 4, 1929, he again purchased twelve muskrats and a ranching service contract for $1050. The evidence does not disclose that any new representations were made to McKinney to bring about this purchase. About that time McKinney, as a bonus, received a block of stock in the Peoria Fur Farms for good will and advertising purposes and was elected president of the corporation, which office he continued to hold until the following March. Just whether McKinney became president of the corporation before or after the making of the second contract is not clear, as in his evidence he placed the time of his election both before and after the making of the contract. The second contract, however, upon which this indictment is based, was signed by McKinney as president of the Peoria Fur Farms.

McKinney was fifty-nine years of age and when he first came to Peoria worked for the street car company, after which he went into the meat business with his uncle for three years and then opened a meat shop of his own, which he conducted for three years. He engaged in selling shoes for about eight years, and in 1914 he started the Elevator Locks Company in Peoria, which company has in its employ about twenty men. He has been successfully engaged in business for over forty years and made considerable money. He testified that in 1929 he was not an inexperienced business man or inexperienced in business affairs; that after his first talk with Miller he called up quite a few people inquiring about the fur farm and made an investigation of it; that he talked to a contractor, to an attorney, with whom he had a long talk with reference to the company, to a merchant and to an officer of the Central National Bank and that he believed all they told him, and that as a result of his complete investigation and his inquiries with reference to the various matters represented by Miller and his talks with the various parties of whom he inquired he concluded to invest his money, and that he did not invest any money in the concern until after he had made this extensive investigation. The State attempts to argue from the evidence that the rats were not tame, domesticated rats born and bred in pens but were wild marsh rats.

To justify a conviction on an indictment for the confidence game it is not sufficient to prove the defendant guilty of such acts and fraudulent practices only as would subject him to liability in a civil action, (*Dorr* v. *People,* 228 Ill. 216,) as there may be swindling in a business transaction without the person who is responsible for the swindling being guilty of operating the confidence game. A swindling operation does not constitute a confidence game unless the element of confidence becomes a part of such swindling. (*People* v. *Santow,* 293 Ill. 430.) The essence of the crime of obtaining money by means of the confidence game is a

trust reposed in the swindler and betrayed by him as a means of obtaining the money, and the moving cause for the victim's parting with his money must be the confidence reposed in the accused. (*People* v. *Rallo,* 293 Ill. 304.) Under an indictment charging the obtaining of money or property by the confidence game, proof, merely, that the defendant is guilty of obtaining money by false pretenses does not sustain the charge, but it must further appear that as an element of the transaction the defendant obtained the confidence of his victim by some false representation or device and swindled him. The statute does not cover business transactions between parties on an equal footing, even though there is such fraud or misrepresentation as will subject one of the parties to a civil or criminal action. (*People* v. *Schneider,* 327 Ill. 270.) The gist of the crime is the obtaining of the confidence of the victim by some fraudulent scheme, trick or device, and, after the confidence of the victim has been gained by such fraudulent means, abusing his confidence and obtaining his property by some fraudulent or swindling transaction. (*People* v. *Snyder,* 327 Ill. 402.) Where the confidence of the injured party is honestly obtained through a course of legal business dealings and the one in whom confidence is reposed breaches that confidence to the injury of the one reposing it, the statute defining and prohibiting the obtaining of money by means and by use of the confidence game is not violated. (*People* v. *Perlmutter,* 306 Ill. 495.) Nor does the fact that one improvidently invests his money on the judgment of one in whom he has confidence, and thereby loses his money, constitute the crime. (*People* v. *Benton,* 324 Ill. 331; *People* v. *Bischoff,* 319 id. 262.) Where the property is obtained by unlawful means other than by fraudulently obtaining the confidence of the victim and then abusing the confidence so obtained a conviction for the confidence game cannot be sustained. (*People* v. *Snyder, supra; People* v. *Ingravallo,* 309 Ill. 498.) No conviction is permitted to stand except where the confidence is obtained by some

fraudulent scheme, trick or device and the confidence so obtained is breached in the obtaining of the property of the victim. (*People* v. *Snyder, supra,* and cases cited.) In the present case the evidence conclusively shows, without passing upon the question as to whether or not any false representations were in fact made to induce McKinney to sign the contracts and invest his money, that he did not invest his money by reason of confidence which he reposed in Miller and which Miller had obtained by some swindling device, but that he invested the money as the result of his own business judgment based upon his own independent investigation, and that therefore at least one of the elements necessary to constitute the obtaining of money by means of the confidence game is lacking in this case.

The judgment of the circuit court must therefore be reversed.

*Judgment reversed.*