(No. 21324.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PERCY B. SULLIVAN, Plaintiff in Error.

*Opinion filed June 24, 1932—Rehearing denied October 11, 1932.*

F. R. WILEY, C. C. MARTIN, and J. M. BOYLE, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ELMER O. FURROW, State's Attorney, J. J. NEIGER, and O. W. LONGENECKER, (JOHN H. LEWMAN, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

Percy B. Sullivan and W. K. Tuttle were jointly indicted in the circuit court of Vermilion county on the charge of obtaining the property and money of John Elliott by means of a confidence game. The charge was dismissed against Tuttle during the trial but Sullivan was found guilty

and sentenced to an indeterminate term in the penitentiary. By this writ of error he brings the cause here for review.

Sullivan called at the farm home of Elliott on April 10, 1930, and discussed with him the sale of a generator for use in a carbide gas-lighting system. The two men were strangers to each other and there met for the first time, although Sullivan had been to the place previously and talked to Mrs. Elliott about the same matter. On that day a contract was entered into by which Elliott agreed to purchase a generator from the Standard Light Company of Decatur for the sum of $195. To secure the purchase price a promissory note, judgment in form, was signed by Elliott at the same time he signed the contract. The contract was a printed form, with certain blanks containing necessary data filled in by Sullivan. It embodied the printed statements, "no verbal statement or agreement made before or after the signing of this contract has been relied on or shall be binding," and "this order not subject to cancellation by the purchaser except with the consent of the seller, in which case one-half the purchase price will be paid as liquidated damages. In case any time is agreed on with the company dealer or salesman to test merits of plant or make sales in vicinity, negotiable note for one year or less at six per cent interest will be given to pay for plant, purchaser to rely on his efforts to secure prospects for sales." On the back of the contract was a provision that entitled Elliott to a credit of $75 on the purchase of every light plant sold by the company through Elliott's coöperation until the plant was paid for. After that he was to receive $37.50 in cash on all sales made with his help. The $75 credits were to be given on the note or paid in cash. Elliott was to receive five dollars for each prospect brought by the salesman of the company to look at his plant. It was also provided that if enough sales were not made in three years, under certain conditions the company could either remove the plant from Elliott's place or he could buy it at one-half price or con-

tinue the selling beyond the three-year period. The note was due six months after date and bore six per cent interest per annum. No language appeared in the note restricting its negotiability, and it was to all appearances an ordinary judgment note, such as is commonly used in business transactions.

The contract did not fix any time for the delivery of the generator. According to Elliott, Sullivan told him the generator was not going to cost him anything as it was to be put in as a demonstrator and all that Sullivan wanted was the opportunity or right to demonstrate the plant in Elliott's home. Elliott told how he objected to the signing of the note and of Sullivan telling him "the note will be held by us for three years; at the end of that time, if you haven't sold enough generators so that the commissions on them will pay for your plant, then we will take it out if you aren't satisfied with it or you can leave it for half price." Elliott further testified that Sullivan verbally agreed to install the plant within thirty days, but this agreement was not incorporated in the contract. Elliott admitted that he read the contract before he signed it but was not sure about reading the note before he attached his name to it. On the same day the contract and note were signed Sullivan discounted the note at a bank for $175. He had previously ascertained that the bank would buy a note executed by Elliott. Soon after the note became due Elliott paid it.

The evidence is conflicting on the question of whether an effort was made to deliver the generator or an offer of delivery was tendered by the defendant or the Standard Light Company to Elliott. Orval Osborne testified that he had called on Elliott during the latter part of April or early May of 1930 to ascertain if it would be all right to deliver his generator in the fall, when the company was to deliver another in Elliott's neighborhood. He said that Elliott told him it would be all right. No one else was present when

this conversation was held, according to Osborne, although someone else was in the house. Elliott admitted conversing with Osborne but not at home, saying that he stated to Osborne he was ready for the generator any time they were ready. In response to Osborne's query if he was ready to have the generator installed Elliott denied that Osborne asked for a postponement of delivery, but, on the contrary, said that he would come back the following week. Tuttle, the co-indictee, testified that while working for the Standard Light Company in the first week of September, 1930, he had called upon Elliott; that he was alone when he reached the Elliott home but had been accompanied to a point several miles from Elliott's by J. B. Tuttle, his son, who was driving a truck loaded with two generators, and that one of these generators was destined for Elliott's place and the other for a farm near there belonging to one Berglund. Tuttle said he did not have the truck come. on to the Elliott place as the roads were so rough from that point to the farm that he did not want to subject the generators to further jolting until he found out if Elliott would accept delivery. He did this, he said, because, as he told Elliott at the time, he understood there had been some misunderstanding between Elliott and the company about the generator and he was not sure Elliott would let him install the light plant. Tuttle testified that Elliott on this occasion told him, "owing to the condition of things I don't think we are going to put that plant in now. I am not sure I will be here for another year and I want to throw that deal out." Tuttle said he would have to communicate this to the company and offered to take a letter from Elliott to the company. Elliott then wrote a letter to the company which he gave to Tuttle, who delivered it to the addressee. In this letter, which the defendant introduced in evidence, Elliott asked to be released from taking the generator as he was thinking of selling out in the fall, and said that owing to hard times he did not know of a prospect and asked for

the return of the contract and note. The testimony of J. B. Tuttle agreed with that of his father respecting the truck loaded with the two generators not going to the Elliott farm on account of rough roads. This witness said that Sullivan told him to deliver the two generators to Berglund and Elliott. On rebuttal, Elliott said that although Tuttle came to his place he did not say that he had the generator with him ready to install. Tuttle saw Elliott again about a month after his first visit but could not get him to accept the generator.

About one week after Elliott had paid his note at the bank Sullivan and Tuttle were indicted. During the course of the trial the court permitted many witnesses for the prosecution to testify, over the objections of the defendant, concerning various deals they had made with Sullivan. These deals were independent of and not related to his deal with Elliott. Some of these transactions had occurred over four years prior to the one with Elliott. This evidence was admitted upon the theory that it was proper to show similar transactions for the purpose of showing guilty knowledge, motive and intent, and that the defendant had obtained the money or property of other persons by the same alleged confidence scheme. The trial court also refused to allow the defendant to introduce evidence to show that the Standard Light Company was a *bona fide* concern and had sold a large number of generators in that locality over a course of years and that the defendant had conducted its business in good faith and with no wrongful motives.

In order to sustain a charge of obtaining money or property by means of a confidence game it was necessary in this case for the State to establish, beyond all reasonable doubt, that the defendant Sullivan first endeavored to, and did, obtain the confidence of Elliott, and having gained such confidence he obtained the money or property of Elliott by the abuse or betrayal of such confidence. Such proof is wholly missing in the present case. The evidence

shows that Elliott knew that he was dealing with a total stranger, and that the two men stood on an even footing and dealt at arm's length. The evidence falls short of showing, beyond a reasonable doubt, that the Standard Light Company, under which name Sullivan conducted his business, entered into the contract with Elliott not for the purpose of carrying it out but for the purpose of swindling him. Of course, it is not denied that Sullivan told Elliott his note would be held for three years and that the generator would be delivered in thirty days. The time of delivery is not at all germane to the offense charged, inasmuch as the evidence is clear that Elliott waived the thirty-day delivery provision by agreeing to accept delivery at a later date. It is evident that Elliott did not rely on the note being held for three years, for he signed the contract and the note, as the weight of the evidence discloses, not upon that statement of Sullivan's but upon the belief that he would be able to acquire a generator without ultimate cost to himself. Further, when Elliott paid the note he did not protest to the banker that Sullivan had sold the note in violation of a verbal statement to hold the same for a longer period. The letter which Elliott wrote to the Standard Light Company places his desire not to accept the generator upon a different ground than the violation of his confidence. The testimony of the witnesses who testified to similar transactions with Sullivan also failed to show the presence of that necessary ingredient—*i. e.,* the obtaining of one's confidence by any of the means named in the statute and the violation of that confidence. This lack of similarity and the remoteness in time of those instances to the Elliott deal rendered their testimony wholly incompetent. The admission of this evidence was highly prejudicial to the defendant, as the different acts complained of were not additionally shown to be criminal offenses.

The essence of the crime of obtaining money by means of the confidence game is a trust reposed in the swindler

and betrayed by him as a means of obtaining the money, and the moving cause for the victim's parting with his money must be the confidence reposed in the accused. (*People* v. *Rallo*, 293 Ill. 304.) The statute does not cover business transactions between parties on an equal footing, even though there is such fraud or misrepresentation as will subject one of the parties to a civil or criminal action. (*People* v. *Schneider*, 327 Ill. 270.) The gist of the crime is the obtaining of the confidence of the victim by some fraudulent scheme, trick or device, and, after the confidence of the victim has been gained by such fraudulent means, abusing his confidence and obtaining his property by some fraudulent or swindling transaction. Where the property is obtained by unlawful means other than by fraudulently obtaining the confidence of the victim and then abusing the confidence so obtained, a conviction for the confidence game cannot be sustained. (*People* v. *Snyder*, 327 Ill. 402; *People* v. *Ingravallo*, 309 id. 498.) No conviction is permitted to stand except where the confidence is obtained by some fraudulent scheme, trick or device and the confidence so obtained is breached in the obtaining of the property of the victim. (*People* v. *Miller*, 344 Ill. 556.) In the present case the evidence unquestionably fails to disclose the presence of that element of confidence or trust reposed in Sullivan by Elliott and the betrayal thereof by Sullivan with the object of obtaining some of the money or property of Elliott. Lacking these essentials the evidence did not warrant the conviction of Sullivan under the confidence game provisions of the Criminal Code.

The judgment of the circuit court of Vermilion county is therefore reversed.

*Judgment reversed.*