No. 16,873.

McBride *v.* The People.
(248 P. [2d] 725)

Decided September 15, 1952.

Mr. Joseph J. Dolan, for plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. Norman H. Comstock, Assistant, for the people.

*En Banc.*

Mr. Justice Clark delivered the opinion of the court.

Plaintiff in error, to whom we herein refer as defendant, was convicted upon a jury trial of "confidence game," under section 222, chapter 48, '35 C.S.A., and sentenced to serve a term of not less than one and one-half years nor more than five years in the state penitentiary. The statute, in so far as here pertinent, reads as follows: "Every person who shall obtain, or attempt to obtain, from any other person or persons, any money or property by means of or by use of brace faro, or any false or bogus checks, or by any other means, instrument or device, commonly called confidence games, shall be liable to indictment, and on conviction shall be punished by imprisonment in the penitentiary for any term not less than one year, nor more than twenty years."

The information is based upon a check drawn by defendant upon the Mercantile Bank & Trust Co., Boulder, in the amount of $65.00, dated November 3, 1951, payable to the order of Nederland Super Market, which check is designated in the record as Exhibit A. Other checks designated as Exhibits B through G, respectively, were received in evidence pursuant to offer thereof for the purpose of showing plan, design, motive, and intent.

The record discloses that on October 29, 1951, defendant opened an account in The Mercantile Bank & Trust Co., with a deposit of $55.00; that no additional deposits were made; that on the very day of opening the account, defendant cashed a check for $35.00, leaving a balance of $20.00; that on November 1st the balance was $16.50, and on November 3rd was $12.42.

Robert Childers, the complaining witness, was owner of, and with his wife, Marion, operated, the Nederland Super Market. Defendant and his wife resided in a rented cabin at Nederland, where defendant was employed by a mining company. For some weeks prior to November 3, 1951, defendant had been a customer of the Nederland Super Market, and thus in a business way had become acquainted with Robert and Marion Childers. Within the presence of one or the other of them he had discussed with their butcher at the meat counter the matter of purchasing a house at Nederland, and also concerning a special order for corned beef, indicating permanence of residence. Prior to that date they also had accepted from defendant one or two small checks, which had cleared without any difficulty. On October 30, 1951, defendant cashed his check for $40.00 at the Nederland Super Market, and this check was outstanding and had not yet been returned when, on the evening of Saturday, November 3rd, 1951, he asked Mrs. Childers if she would cash his check for $65.00 (Exhibit A). Defendant stated to Mrs. Childers that he had that afternoon received word that his wife was to be released that evening from the hospital in Boulder; that he could not get to Boulder to get a check cashed at the bank; and that he was anxious to get his wife back home to keep house for him because he was getting tired of batching. Mrs. Childers had previously heard that Mrs. McBride was in the hospital in Boulder; she did not question defendant about his bank account or ask him if his check was good, but promptly cashed it for him without hesitation. This check and likewise

the $40.00 check (Exhibit B) were returned by the bank marked "short" and neither has been paid.

On the same evening at about 5:30 o'clock defendant approached the witness Hodgson, operator of a transfer business and general store at Nederland, and with whom he had been trading for some weeks, and asked him to cash a check for $100.00. The witness testified that he told defendant that he could not spare that much money, but would cash one for $50.00, which he proceeded to do. This request likewise was accompanied by the statement that he was in a hurry to go to Boulder to get his wife out of the hospital, and he called attention, as he had on a previous occasion, to his having a contract with the Victory Tungsten Trust and for that reason the witness should know that the check would be good.

On the same evening witness Hansen cashed defendant's check, Exhibit D, in the sum of $20.00 although defendant asked for a larger amount, which the witness could not spare from his business. Hansen was the operator of a filling station at which defendant had been trading for some time on open account, which he paid in cash. Hansen previously accepted from defendant one check in a small amount and which cleared without difficulty. Exhibit D bears date of November 5, but Hansen testified positively that it was cashed on the evening of November 3rd.

Witness May, who operates the Branding Iron Inn at Nederland, cashed one check, Exhibit E, for defendant on November 1st in the sum of $30.00, and on Saturday evening, November 3rd, before Exhibit E came back, cashed another check in the sum of $30.00, Exhibit F, which, however, bears date of November 2nd. The witness testified that on that afternoon defendant was in his establishment for two or three hours, and asked to have the check cashed in order to get his wife out of the hospital because the bank would be closed on Saturday afternoon.

All of the above-mentioned checks were furnished by

defendant; were taken from a check book in his possession; and none were honored by the bank. In addition to the aforesaid checks, there is Exhibit G, made out on a counter check form given to Peters Market in Boulder, dated October 27, in the sum of $70.00, which likewise was returned from the same bank marked "short."

After cashing the checks on the Saturday afternoon or evening of November 3, 1951, as above detailed, defendant drove to Boulder where he met his wife and immediately left the state of Colorado and went to Kansas City, where, about a month and a half later he was arrested on a fugitive warrant, waived extradition hearing, and was returned to Boulder for trial.

At the conclusion of the presentation of evidence on the people's case in chief, counsel for defendant moved for a directed verdict on the ground that the evidence was insufficient to sustain a conviction of the offense with which defendant was charged. Upon the overruling of this motion, counsel representing defendant likewise rested his case, and declined to call any witnesses or introduce any evidence. Thereafter, in due course the defendant's motion for new trial was overruled, and he is now here on writ of error containing three assignments: (1) That the trial court erred in refusing to grant defendant's motion for acquittal because of insufficiency of the people's evidence to establish a prima facie case; (2) that the verdict was contrary to the evidence and to the law in that there was no showing that defendant tried to gain the confidence of the complaining witness nor that the complaining witness reposed confidence in the defendant; (3) that the verdict was contrary to the evidence and law as there is no showing that the checks involved in said cause were false or bogus checks. These assignments counsel for defendant groups and presents under two headings:

(A) Was the check Exhibit "A" a false or bogus check?

(b) In passing the check Exhibit "A" did the defend-

ant resort to any fraudulent scheme by which he sought to obtain the confidence of the complaining witness and did the complaining witness repose any special confidence in the defendant?

We will discuss these questions in the same order as presented by counsel.

(A). Was the check, Exhibit A, false and bogus? These words have many times been judicially defined, and we select but a few of the many decisions as illustrative of the legal meaning of these terms.

■ ■ False "denotes an intentional, deliberate and wilful untruth, something beyond mere inaccuracy." *Heindel v. United States,* 150 F. (2d) 493, 497, C.C.A. Ohio. "False" should be construed to mean "intentionally or willfully untrue." *North American Accident Insurance Co. v. Tebbs,* 107 F. (2d) 853, 856, C.C.A. Utah. "False" may mean untrue or it may mean designedly untrue, implying an intention to deceive. *W. T. Rawleigh Co. v. Brantley,* 197 Miss. 244, 19 So. (2d) 808, 811, 157 A.L.R. 188. "The words 'sham' and 'false' are synonymous." *Howe v. Elwell,* 67 N. Y. S. 1108.

In an early Arizona case, *Williams v. Territory,* 13 Ariz. 27, 108 Pac. 243, which has become recognized as a leading authority on this subject, may be found a number of definitions of the terms, false and bogus. That court therein said, in 108 Pac. 245, that a check is false "within the statute when it is a willfully untrue written order, directing a bank to pay money on demand.", and further "a check given by a person upon a bank in which he has no funds, and which he has no reason to suppose will be honored, is bogus within the statute."

In *In re Rosenfeld,* 262 Fed. 876, 879, there is quoted with approval the following from *Sallies v. Johnson,* 85 Conn. 77, 82, 81 Atl. 974, 976: " 'False' may mean untrue, or it may mean designedly untrue, implying an intention to deceive. When applied to the representations of

one inducing an act to another's injury it implies a purpose to deceive."

The Colorado Statute, section 222, chapter 48, '35 C.S.A., simply stated, is, in effect, that every person who shall obtain any money or property of another by means commonly called confidence games, shall be liable. Such "confidence games" may be either (1) by use of brace faro; (2) by false or bogus checks; or (3) by any other means, instrument or device. *Chasse v. People,* 119 Colo. 160, 162, 201 P. (2d) 378.

██ ██ The essence of the offense is the plan and purpose of the perpetrator to swindle another of his money or property. To swindle is to trick and cheat another of his possessions by falsehood, cunning or conniving scheme. " 'Confidence game is any swindling operation in which advantage is taken of a confidence reposed by the victim in the swindler.' " *Lace v. People,* 43 Colo. 199, 204, 95 Pac. 302. Any plan or scheme of trickery wherein any false token or thing is made use of to accomplish the intended result constitutes a "confidence game." No single definition can cover the range of possibilities of this offense, for they are as " 'various as the mind of man is suggestive.' " *Kelly v. People,* 121 Colo. 243, 251, 252, 215 P. (2d) 336, citing with approval in this connection, *Powers v. People,* 53 Colo. 43, 123 Pac. 642; *Elliott v. People,* 56 Colo. 236, 138 Pac. 39; *Peiffer v. People,* 106 Colo. 533, 107 P. (2d) 799. Each instance depends upon its own peculiar facts and circumstances. The gravamen of the offense is not so much by what *means* was the victim filched, but the *intent* of the perpetrator in effecting his unrighteous objective.

It is contended on behalf of the defendant that the statute was not violated because the check was neither false nor bogus; that it was a genuine check drawn on an existing bank in which defendant actually had an account and that it bore his own, and not a fictitious, signature. Respectable authority is cited to the effect that such a check is not false or bogus. With this ver-

sion of the statute we are not in agreement and in a recent decision of this court we have held to the contrary. *Munsell v. People*, 122 Colo. 420, 222 P. (2d) 615. A check calling for $65.00 upon a bank wherein the maker knows he has less than $20.00 on deposit and intends to put no more in, is as false and bogus as any check could be. The only genuine thing about it is its form and signature, but it is not worth the paper on which it is written, and this fact is known to the maker when he offers it.

(B) Did the defendant resort to any fraudulent scheme by which he sought to obtain the confidence of the complaining witness, and did the complaining witness repose any special confidence in the defendant?

■ The offense was not a crime at common law, and under ordinary circumstances the statute would be subjected to strict construction. The legislature, however, specifically provided to the contrary by declaring that it "shall be liberally construed for the detection and punishment of offenders against the provisions of section 222 of this chapter." Section 224, chapter 48, '35 C.S.A. Care, therefore, need be exercised that neither by illogical construction nor by loose language it be so circumscribed as to defeat its purpose and usefulness.

Some courts, it would seem, have at times been inclined to over-emphasize the word "confidence" as used in the statute, and unduly restrict the meaning thereof. "Confidence," as used in law, generally has a relative and frequently a variable meaning. A man might have sufficient confidence in another to loan him $100 on his promise to repay it, or to cash his check for that amount, whereas he would not trust him to the extent that he would permit him to go to the till and count the money out to himself. Also, it is true that this same man, while trusting A for a loan of $100, although lacking confidence in him to count it out to himself, might willingly let B do just that very thing. Thus is illustrated the relativity of the term. Confidence also is variable. The

class known as "confidence men" play upon different keys, according to conditions and circumstances. In some instances they play upon the credulity of their intended victim; in others upon the greed, or sympathy, or other human traits. Frequently they rely only upon the good nature and spirit of cooperation, willingness to be helpful, and a natural desire of being accommodating, or a combination of these attributes in the one whom they intend to cheat and swindle. A victim actuated by greed in many instances knows that he is dealing with a crook and would not trust him out of his sight, and yet to him the scheme appears so foolproof that he has "confidence" that this knave will work a fat profit to his advantage. When he is thus taken in and swindled, the crime is as complete as if the victim had truly believed the crook to have been entirely reliable.

To a person of good will and without reason of suspicion, a desire to be accommodating might easily lead to ample confidence in a regular customer of his establishment to believe that his proferred check for cash represented to be urgently needed would be paid. The giving of the check implied that the maker had funds in the bank upon which it was drawn to cover it. Conduct is often more expressive than words. *State v. Hammelsy*, 52 Ore. 156, 96 Pac. 865, 866; *State v. Moore*, 189 Wash. 680, 66 P. (2d) 836. This principle has been adopted in Colorado by our court in the case of *Munsell v. People, supra,* wherein approval was had of the findings of the trial court in effect that where the confidence of one is obtained through the conduct and representations of another who obtains the money or property of his victim by means of a false check, such constitutes a swindling operation within the contemplation of the statute. In the case at bar the defendant asked if he might have his check cashed, and under such circumstances, his signing and tendering the same was as much a representation of its worth as would have been his

oral assurance of its payment had he been directly questioned specifically in that regard.

Past experience with defendant's checks in smaller amounts would indicate his reliability. His representation of need for cash on this particular Saturday evening might readily have prompted the granting of his request. While it was probably true that cash was necessary to procure the release of defendant's wife from the hospital, this was only a half truth. He failed to reveal to his victim that he had insufficient funds in the bank to pay the check, but by conduct represented it as good. Neither did he reveal that he contemplated leaving the state immediately without intention of returning or leaving a forwarding address. He put his money raising campaign into operation on a Saturday afternoon when the bank was closed and would not be available for information until the opening for business on the following Monday morning. The situation is such that the issue becomes solely one of intent. It is true, as stated in *People ex rel. v. District Court*, 119 Colo. 451, 457, 208 P. (2d) 79, that all short checks are not false and bogus checks within the meaning of the confidence game statute, and that it takes more than merely a "short" check to constitute the offense, as was the situation in *People v. Lindsay*, 119 Colo. 248, 202 P. (2d) 951, upon which counsel for defendant herein strongly relies. Each case must be determined upon the facts presented therein, and circumstances pertinent thereto, and in the Lindsay case it is apparent from the recitation of facts in that opinion that no representations whatever were made, and nothing by way of inducement said to the taker of the check, to cause him to cash it.

As we have heretofore indicated, we are convinced that the primary issue in general in prosecutions under this statute, and in the instant case in particular, is one of intent. Was it the intent of the defendant, by deliberate plan, scheme and design, and by means of

such (known to him to be) worthless, false and bogus check, to trick, cheat and swindle another of his money or property? The evidence of similar transactions offered to show such purpose, plan, scheme and design was properly admitted. Intent is always a question to be determined by the jury from all the evidence in the case.

In the case at bar the evidence was sufficient to establish a prima facie case against defendant. He did not take the witness stand to deny or explain a single one of the facts or circumstances. The jury was properly instructed concerning the elements of the offense, and by its verdict found defendant guilty as charged. Upon hearing of defendant's motion for new trial the court refused to disturb the jury's verdict and entered judgment in accordance therewith, which judgment we hereby affirm.