No. 18,569.

JOHN CARVER PATTERSON *v.* PEOPLE OF THE STATE OF COLORADO.

(333 P. [2d] 1047)

Decided January 12, 1959.

Mr. WILLIAM O. DeSOUCHET, for plaintiff in error. Mr. LINDSAY FISCHER, Mr. JOHN HOVER, student counsel of the University of Colorado Legal Aid Clinic, with him on the briefs.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK

E. HICKEY, Deputy, Mr. JOHN W. PATTERSON, Assistant, Mr. ROBERT DELANEY, District Attorney, Ninth Judicial District, for defendant in error.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

PLAINTIFF in error, to whom we will refer as defendant, was convicted of confidence game upon a jury trial and sentenced to serve a term in the state penitentiary. The statute under which conviction was had, so far as here pertinent, reads as follows:

"Brace faro, bogus checks, penalty. — Every person who shall obtain, from any person or persons, any money or property by means of or by use of brace faro, or any false or bogus checks, or by any other means, instrument or device, commonly called confidence games, shall be liable to indictment, and on conviction shall be punished by imprisonment in the penitentiary for any term not less than one year, nor more than twenty years." C.R.S. '53, 40-10-1.

The information is based on a check dated January 9, 1957, in the sum of $75.00 drawn by J. C. Patterson on the First National Bank of Glenwood Springs, Colorado, and payable to Jack Patterson, marked "Expense account for December." This check, appearing in the record as Exhibit A, was endorsed "Jack Patterson" and cashed by defendant at City Market in Glenwood Springs, Colorado. City Market is a trade name under which the market is operated by Prinster Bros., a copartnership. "Jack Patterson" and "J. C. Patterson" are one and the same person. Other checks drawn and cashed by defendant were received in evidence for the purpose of showing plan, design, motive and intent.

A statement of the pertinent facts follows:

For several months before Exhibit A was cashed de-

fendant had been employed by J. L. Clapper, doing business as Hap's Trading Post, Leadville, Colorado. In December 1956 Clapper arranged and conducted a sales promotion of Necchi-Elna sewing machines lasting about ten days in City Market stores, Glenwood Springs, Colorado. In the course of the promotion, two machines were given away and demonstrations of the sewing machines conducted.

On December 24, 1956, coincidental with the conclusion of the City Market sales demonstrations, defendant opened a bank account with the deposit of a check in the amount of $200.00 from Clapper at the First National Bank in Glenwood Springs. The balance in this checking account on December 27th was $3.39; December 28th the defendant deposited $50.00; December 31st $120.00 and on January 2, 1957, $12.50. Defendant's bank balance amounted to 89 cents on January 5, 1957. At that time there were, in addition to other items, outstanding checks, one for $90.00 and one for $65.00 to Lowell Jensen. Both of these checks were dated December 30, 1956.

With this bank balance of 89 cents and more than $155.00 in outstanding checks, defendant called Mr. Wagaman, Manager of the City Market, stating he had a check for an expense account in the amount of $95.00 and asked if he could cash it. Defendant presented the check to Mr. Wagaman who approved and cashed the check; defendant receiving cash and merchandise for a total of $95.00.

Within the next few days defendant carried out a series of transactions, one of which was the cashing of the check for $75.00, upon which this prosecution was based, at City Market. Since they are all connected and form a part of the same general transaction, a brief summary is here presented.

During October 1956 while working for Clapper at Leadville, defendant sold a washing machine to Mrs. Marguerite Osborne of Breckenridge, Colorado, with a

balance of purchase price, after tradein, of $295.75. A chattel mortgage was prepared and signed covering such balance, which, together with carrying charge, amounted to $355.45, payable to defendant's employer in fifteen monthly installments of $15.00 each. This chattel mortgage was assigned to a finance company by Clapper, and, as assigned, duly recorded. Later Mrs. Osborne wrote Clapper advising that when the washing machine was installed and working satisfactorily she would pay the balance of the purchase price without delay.

Following the cashing of the $95.00 check at City Market on January 7, 1957, defendant proceeded to Leadville where he procured the file of the Osborne account; went to Breckenridge; called upon Mrs. Osborne; serviced the washing machine which he had sold to her as agent for Clapper; falsely represented that he had been in the hospital as a result of a broken collar bone suffered in an automobile accident as an explanation of his failure to promptly care for her complaint; represented that he was authorized to collect the balance of account reflected by the chattel mortgage and persuaded her to give him a check for a discounted balance on the chattel mortgage in the sum of $265.75, which was, at defendant's request, made payable to Jack Patterson, dated January 7, 1957, and drawn upon the Bank of Denver. Mrs. Osborne explained to defendant that it would be necessary for her to arrange a transfer of money from her savings account to her checking account in the Bank of Denver before there would be sufficient funds therein to cover the check. Defendant assured her that the check would not be deposited for a week, allowing adequate time for the transfer to be completed. He then wrote out and delivered to Mrs. Osborne a purported release of the chattel mortgage marked paid in full by check in the amount of $265.75, endorsed "Pd in full, Jack Patterson" on Clapper's file copy of the chattel mortgage, both of which documents were delivered to Mrs. Osborne.

Defendant returned to Glenwood Springs and on the

following morning wrote a bank deposit slip consisting of the Osborne check for $265.75, plus cash in the sum of $20.25 [being part of the proceeds of the $95.00 check previously cashed at City Market against the same account] and instructed Pauline Worden, an office employe, to deliver the same to the bank. The bank officials, not knowing the circumstances connected with the Osborne check, credited the deposit to his account on their records, and on that basis honored the $95.00 check presented for payment by the City Market; honored a check for $32.50 written by defendant to the same Pauline Worden on January 8, 1957, the day of the ostensible deposit. These items, together with another check for $5.20 and bank charge of 65 cents, reduced the apparent balance to $154.19.

In the afternoon of the same day defendant prepared the check for $75.00, again called Mr. Wagaman, stating he had an expense account check for $75.00 and asked that it be cashed, to which Mr. Wagaman agreed. Defendant proceeded to City Market where the check was cashed.

Defendant cashed an additional check at City Market for $10.00 on January 10, 1957, marked "Expense Trip to Aspen $10.00."

People's Exhibit A, the check for $75.00, was deposited by City Market at the First National Bank, and while still in the bank's hand, on January 10, 1957, notification was received by the bank that the Osborne check was rejected by the Bank of Denver for insufficient funds. The Bank then notified Mr. Wagaman of the City Market that the $75.00 check (Exhibit A) was rejected, and also called defendant concerning the Osborne check, and was asked by defendant to put the check through again; that it would be good; that the party who drew the check had to transfer some funds from another account and, as the representative of the bank, Mr. Quimby testified: "I asked him if there would be any other reason the check might be dishonored, such

as a stop-payment, and he said no, so we sent the check through banking channels again on January 12th." Thereafter, the check was returned with payment stopped by Mrs. Osborne.

According to Mr. Wagaman, defendant "told me that he had transferred an account, one account from one bank to another, or something similar to that; to go ahead and run this check back through, that it would be good, so I took his word for it and started to present it to the bank."

The specific object of the confidence game act is to reach and prevent acts, conduct and operations such as were indulged in by defendant.

█ The confidence game statute provides that it "shall be liberally construed for the detection and punishment of offenders against the provisions * * * " thereof. And this has been construed to mean that "Care * * * need be exercised that neither by illegal construction nor by loose language it be so circumscribed as to defeat *its* purpose and usefulness." *McBride v. People,* 126 Colo. 277, 248 P. (2d) 725.

█ Here, by a course of conduct more expressive than words, defendant induced the manager of City Market to cash a printed check of misleading character drawn by J. C. Patterson and made payable to Jack Patterson with the entirely fictitious notation "expense account for December."

*McBride v. People,* supra, furnishes a complete answer to the contentions of present counsel for defendant, who do not contend that defendant was not represented by competent counsel appointed by the court upon trial of the case.

No objection was made to the instructions given by the trial judge, neither were additional instructions tendered on behalf of defendant. We have examined the instructions given and find no error therein.

A critical reading of this record discloses that the jury was well within its province in concluding that defend-

ant was guilty as charged. The course of conduct pursued by him as disclosed by the evidence, reveals a plan or scheme so well conceived and carried out as to fall well within the statute under which he was prosecuted. *McBride v. People,* supra, is directly in point, and we think conclusive of the issue here presented.

Perceiving no prejudicial error in the record, the judgment is affirmed.