[No. 7023.]

WHEELER v. THE PEOPLE.

Criminal Law—Swindling—Confidence Game—To constitute the offense of obtaining money or property under Mills' Stats., sec. 1332 (Rev. Stats., § 1783), something more than mere words must be employed. The obtaining of advances of money by promises to invest it in mining enterprises, accompanied by assurances of large gains, under pretense of ability to read the future, will not suffice.—(408, 409)

*Error to Denver District Court*—Hon. GREELEY W. WHITFORD, Judge.

Mr. FRANK MCLAUGHLIN and Mr. LESLIE E. HUBBARD for plaintiff in error.

Hon. JOHN T. BARNETT, attorney general, Mr. JAMES W. BRINSON, deputy attorney general, and Mr. ELMER L. BROCK for the people.

Mr. JUSTICE WHITE delivered the opinion of the court:

The defendant, in three cases, was charged with, tried for and convicted of obtaining, from different persons, their respective moneys by means of confidence games. The cases were consolidated for trial, and separate verdicts rendered in each, finding the defendant guilty as charged. After motions for new trial, and in arrest of judgment, were interposed and overruled, sentence of the defendant to the penitentiary was imposed in each case, the judgments running concurrently. To reverse these judgments, this suit is prosecuted.

The first case was filed August 10, 1909, and the prosecuting witness therein was Augusta C. McCotter, from whose testimony it appears that she and defendant were slightly acquainted; that the former had done laundry work for the latter; that Mrs. McCotter's husband had died leaving in her favor some

life insurance policies which she had collected; that she was, however, having trouble in the collection of one such policy, and called upon the defendant at her place of residence for advice relative thereto; that defendant had previously, and at that time, told the prosecuting witness of her mining investments, and that the latter would be very lucky in the mining business if she would invest therein. And, quoting from such testimony: "She (the defendant) asked me to loan her one hundred dollars to invest in mining stock, that she could get me big returns. I at first kind of thought differently, but she kept telling me of the returns she could make.  *  *  * I went to the bank the next day (March 18, 1908) and drew out one hundred dollars and gave it to her, but before I went out she began talking about different things, and she finally said: 'Don't you think you could put up another hundred?' and I said, 'No, sir; I am saving this money to educate my children'." ·

"Q.—At this time did she make any claim about being able to read your future? A.—She told me, she said: 'I see over your head, there is lots of money, and if you would invest a little money, you will get good results, you will be lucky.' And she at the same time told me not to tell anybody, because if I told anybody, I would not be lucky."

Mrs. McCotter further testified that she did not know whether defendant invested the money in mines; that defendant never delivered to her any mining stock or deeds. In cross-examination, the following appears:

"Q.—And in the conversation that occurred, she asked you to invest the money in mines? A.—She asked me to lend her the money to put in mining stock.

"Q.—When was she to pay the money back to you? A.—Inside of a year.

"Q.—When was the year up? A.—The 18th of March, 1909.

"Q.—This money that you had obtained, you went to Mrs. Wheeler and offered her a loan? You wanted to loan her that money, didn't you? A.—It was just this way; I wanted to loan her the money if she could make good returns for me, and she said that she could."

The second case was filed September 1, 1909, and the prosecuting witness therein was Amy E. Lanyon, from whose testimony it appears that she and defendant became acquainted November 12, 1906, through a friend, Miss Hattenhauer, who had advanced some money to the defendant to invest in mines; that evening, the complaining witness, her mother and Miss Hattenhauer, called on the defendant at the latter's request; that the defendant expressed herself as being sorry to see the complaining witness working so hard; that defendant had just returned from Goldfield, and said she had an interest in a mine, and wanted to invest the latter's money therein; that she needed $1,000.00; and prosecuting witness agreed to, and did, give her that amount in payments, the first on November 14, 1906, and the last on September 13, 1907; that the money belonged jointly to prosecuting witness and Mrs. M. A. Lanyon. And, quoting from such testimony:

"Q.—Did she at that time claim to exercise any powers of vision? A.—She said she could see wealth over my head, and also great wealth at my feet.

"Q.—Did she say anything else? A.—You mean at that time?

"Q.—Yes? A.—Nothing at that time in regard to that.

"Q.—What were you relying on? A.—She told me she had an interest in this mine; that she required this amount of money to develop it. She said that

she had an interest in the mine; otherwise I wouldn't have given her the money.

"Q.—How much of an interest were you getting in the mining investment? A.—I believe it was one-third. It is stated on the paper."

The paper referred to was an agreement or receipt written and brought to Mrs. Wheeler by Miss Lanyon, and signed by the defendant, relative to the transaction in question, and is as follows, to wit:

"November 14, 1906.

"Received of Mrs. M. A. Lanyon and Miss Amy E. Lanyon one thousand dollars ($1,000.00) placed in the hands of Mrs. W. W. Wheeler to invest in mines to the best of her ability. After sale of said mines, and three interested parties are satisfied, the remaining profits from said sale are one-half to Mrs. W. W. Wheeler and the other half to aforesaid parties named in this document.

(Signed)     "MRS. W. W. WHEELER."

The third case was also filed September 1, 1909, and the prosecuting witness therein was Lelia A. McNutt, from whose testimony it appears that she met defendant in the millinery store of Mrs. Duffy, who had previously advanced money to the defendant to invest in mines; that the mining proposition was brought up and defendant told the complaining witness that the latter would be very lucky in mining ventures, and, quoting: "She saw money all over my head and all around me and a lot of money for me, and wanted me to go into it."

"Q.—Did she read your hand? A.—She certainly did.

"Q.—What did she say when she read your hand? A.—Everything was bright, lots of money around me, and naturally I went into it.

"Q.—Did you have any views on that subject yourself? (Spiritualism and palmistry.)  A.—No, sir; I was not raised in that way, as I have said; my mother had a horror of it.

"Q.—You are not a believer?  A.—No, sir; not in spiritualism.

"Q.—State what it was that Mrs. Wheeler said that induced you to give her the money.  A.—Such bright prospects."

This witness further testified that she gave defendant $50.00; and the latter was to invest it in mines to the great profit of the witness.  The evidence upon the part of the people further shows that defendant, during the time covered by these transactions, claimed to have certain mines, or be interested in certain mines, in Nevada and California; that she spent some time in those states; that she had there acquired interests of some nature in certain mines, and the title thereto had failed, but whether prior or subsequent to the transactions in question is not disclosed.  This was all the evidence on the part of the people, except that covering alleged similar crimes or transactions, said to have been perpetrated by the defendant upon others than the complaining witnesses herein.

The defendant in her testimony gives the names of certain mines both in Nevada and California, in which she was interested in one way and another, and in which she claimed to have invested the money in question; specifies certain mining stock she had purchased, and details the organization of a mining corporation for the purpose of operating one or more of such mines.  These interests consisted largely in options to purchase, and, perhaps, in no respect were sound business propositions.

To constitute the offense, with the commission of which defendant was charged, tried and convicted,

the "money or property must have been obtained by means of, or by the use of, brace faro, or any false or bogus checks, or by any other means, instrument or device, commonly called confidence games."— Section 1332, Mills' Annotated Statutes.

The people do not contend that the acts of the defendant come within the meaning of the words, "brace faro, false or bogus checks," but maintain that they fall within the meaning of "other means, instrument or device commonly called confidence games." The "confidence game," as defined in Webster's New International Dictionary, is, any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler. This definition is, in effect, quoted and adopted in *Lace v. The People,* 43 Colo. 199, 204. The Century Dictionary and Cyclopædia defines "confidence game" as "A kind of swindle practiced principally in large cities upon unwary strangers."

To constitute the offense, the money or property must have been obtained, or the attempt thereto made, by some false or bogus means, token, symbol or device, as distinguished from mere words, however false and fraudulent. The act of obtaining money, goods or anything of value by false pretenses is made criminal by section 1379, Mills' Annotated Statutes, and it would, therefore, seem that to constitute the crime implied in, and covered by, the words "confidence games," the "swindling operation" must necessarily include something other than mere words.

*Maxwell v. The People,* 158 Ill. 248, states that it is difficult to give a definition of what is commonly called the confidence game, and quotes from *Morton v. People,* 47 Ill. 468, to the effect that the "devices" entering into and constituting the confidence game

are "as various as the mind of man is suggestive," and holds that "the obtaining of money by means or use of what is false or bogus is the offense aimed at," and its essential ingredient is a swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler. In the Maxwell case, "false representation and encouragement" was united with a trick at cards to induce the prosecuting witness to part with his money, and it was held that the elements of false representation and encouragement were mingled with the trick of the cards in such a way as to gain the confidence of the victim, and throw him off his guard, and "together constituted the swindling operation."

In *Pierce v. People,* 81 Ill. 98, in considering the legislative act on the subject, which is identical with ours, it is held: That obtaining credit by false representations in regard to the party's solvency, is not within the contemplation of the statute; that the language of the statute does not expressly extend to cases of money or property, obtained on the belief of ability and disposition of the party to thereafter make payment; but it contemplates a transaction in which the "means or device, instead of being the cause of the cause, is the direct or proximate cause of obtaining the money or property, and, being a highly penal statute, we are not authorized to extend its meaning by implication."

It may be defendant acted fraudulently, but every fraud is not a "confidence game." Obtaining money by loans or advancements, by false representations in regard to her solvency, or ability, or purpose to make profitable investments and return large profits—even if such effect could be properly ascribed to defendant's acts—is not within the contemplation of the statute under which she was prose-

cuted. The complaining witnesses were not deceived by any course of conduct of the defendant in reposing confidence in her, or misled by any device, scheme or swindling operation in which advantage was taken of their confidence. The fact that, contrary to their expectations, the investments were not made, or, if made, proved a failure, does not transform the transaction into a confidence game. Analogous in principle, and similar in language, are *People v. Turpin,* 233 Ill. 452, and *Lory v. People,* 229 Ill. 268.

. Counsel for the people call attention to the fact that in each case the witnesses were told by the defendant that she could see gold, money or great wealth over their heads, under their feet, or around them, and that these were representations of existing facts, and, coupled with the other facts proven, constituted the "swindling operation" in which advantage was taken of the confidence reposed by the complaining witnesses in the defendant. We have already held that something more than mere words, however false and fraudulent, is necessary to constitute the "swindling operation" essential in the confidence game.

It is quite probable that other assignments relied upon would be fatal to the conviction and judgments or sentences imposed, but as the evidence is insufficient to establish the offense of obtaining money from either of the complaining witnesses by means of the confidence game, it is unnecessary to prolong this discussion, and the judgments are, therefore, reversed.                              *Reversed.*

CHIEF JUSTICE CAMPBELL and Mr. JUSTICE BAILEY concur.

Opinion filed January 3, A. D. 1911; rehearing denied February 6, A. D. 1911.