(No. 11915.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JULES F. KOELLING, Plaintiff in Error.

*Opinion filed June 20, 1918.*

1. CRIMINAL LAW—*judgment of conviction for confidence game will be reversed where there is reasonable doubt of guilt.* On writ of error to review a judgment convicting the defendant of obtaining money by means of the confidence game the Supreme Court will determine whether or not there is a reasonable doubt of the defendant's guilt, and if so the verdict and judgment cannot stand.

2. SAME—*what constitutes crime of obtaining money by means of confidence game.* Under the Confidence Game statute the offense consists in gaining the possession of money or property by means of some trick or swindling operation by which advantage is taken of the confidence of the victim reposed in the swindler.

3. SAME—*what does not justify a conviction for the confidence game.* A conviction for obtaining money by means of the confidence game, based on a sale of Texas land by the defendant, is not justified where the evidence does not show that the defendant took advantage of the confidence reposed in him or that the land was not worth the price paid by the buyer, who conducted an independent investigation before buying.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HUGO PAM, Judge, presiding.

EVERETT JENNINGS, (HARRY L. STROHM, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and JOHN K. MURPHY, of counsel,) for the People.

Mr. CHIEF JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error was convicted in the criminal court of Cook county on the first count of an indictment charging him with having obtained from Martha Jansen, on Septem-

ber 24, 1913, $1900 in lawful money by means and by use of the confidence game. The verdict of the jury was rendered on September 20, 1916, and the cause was continued from time to time, pending motions for a new trial and in arrest of judgment, until November 3, 1917, when plaintiff in error by the judgment of the court was sentenced to an indeterminate sentence in the penitentiary, said judgment by agreement of the State's attorney and plaintiff in error being entered *"nunc pro tunc* as of October 11, A. D. 1917." The second count of the indictment, for larceny, was dismissed, on motion of the State's attorney, previous to the entering of the judgment. Plaintiff in error has sued out this writ of error to review the judgment.

The substance of the testimony of the prosecutrix, Martha Jansen, and upon which testimony the State relied for the conviction of plaintiff in error, is the following: In September, 1913, she was about closing a deal for the sale of a house and lot in Chicago. Plaintiff in error asked her what she intended to do with the money, and she informed him that she would like to live in "the outskirts somewhere, on an automobile road, where she could serve chicken dinners." Koelling told her that he had "just such a place in Texas—beautiful Texas;" that it had a nice big club house on it and he would like to have her take charge of it; that the climate in Texas was beautiful, the land very fine and rich and would grow four crops a year; that there was plenty of water on the land and that water pipes were on it; that the well was about six blocks or half a mile away and that she would have all the necessary water required; that there was a grocery store and lots of food there, a canning factory and a school house; that the land was nine miles from San Antonio, two and a half miles from the nearest railroad station, and that it was right on an automobile road; that there were a great many people going down there, many of them Chicago people, and that she could serve dinners and make a nice little income of at least

$20 a week, besides the crops on her land, which she would have to buy to become a member of the club. He also told her to come to his office and he would show her the papers in regard to the beautiful land in Texas and everything in regard to the land. She went to his office and he showed her a prospectus containing pictures and a glowing description of the land. Most all of the descriptions of the land, copied from newspapers and some of them written by Koelling himself, were of such a character as to be readily detected at once by any person of ordinary judgment as mere extravagant puffing so often resorted to by promoters of land sales, and Koelling made it fully known to her that he was such a promoter. The testimony of the prosecutrix further disclosed, according to her version of the matter, that various representations made by Koelling in regard to the land were untrue. She stated that there was no canning factory there, no school house, and that there was no grocery store nearer than five miles; that it was about one hundred and thirty-five miles from the land to San Antonio; that the nearest railroad station was five and a half miles away and that the automobile road was three miles away from the land; that there was no water on the land; that the club house was an old shack filled with mice; that there was no food there and that she lived for three weeks on rabbits; that it was impossible for her to get water on the land, because the water level is eleven or twelve feet lower than the land, and that the land was desert cactus. She admitted in her testimony that the land sold her is supposed to be fertile land, and that there are water pipes on her land and a deep well equipped with a gasoline engine, force pump and stand-pipe near by, and the evidence in the record clearly shows that her land could have been connected with the deep well at a cost of not exceeding $5 per thousand feet of pipe, whereby the land could have been irrigated, and that she clearly understood that the land was not subject to successful cultivation without irrigation. She

never made any attempt to have her land connected for irrigation or to cultivate it in any way, and she admitted that she never had attempted to sell it, and that after she went down to the land she wrote to Koelling stating how she was getting along and that she hoped she would like it, and requested him to send her brooms and soap and things to clean up the club house. There is absolutely no further proof in this record for the People as to the value of the tract of land she bought from Koelling, except that one of the People's witnesses incidentally testified that she would not give $10 an acre for the land. The other evidence for the People in the record is simply testimony of witnesses stating that they had made similar purchases of Koelling, and the question whether or not the prosecuting witness or the other purchasers were swindled out of their money or failed to get value received therefor is left to mere inference by the State's evidence. From the testimony of the defense, by witnesses who were shown to be acquainted with the prices of land in Texas in the vicinity of the land purchased by the prosecutrix, her land was shown to be of the value, after it was cleared, of from $125 to $150 per acre.

Under the rules and regulations of the land company represented by Koelling and from whom the prosecutrix purchased her land, anyone purchasing land had the use and benefit of the club house until such time as he could clear and build on the land purchased and occupy the same. This club house was clearly proven by the evidence for the defense to be a club house built better than the ordinary southern residence, with four large rooms down-stairs and two large rooms up-stairs, and that there was a common kitchen for the use of all members of the club, and that the other rooms were furnished with beds and other furniture. The proof further showed, without question, that all the large tract of land owned by the company from which the land sales were made was very fertile land, covered with cactus and other heavy undergrowth, which required clear-

ing and grubbing at heavy cost, and irrigation, before it could be cultivated. The prosecutrix thoroughly understood this. There was a school house within three-quarters of a mile of her land by air line, and by the road a mile and a half or two miles therefrom. There was a private canning factory in the near neighborhood, and the club members had discussed the plan of organizing one near. the club house. The defendant denied all the prosecutrix's statements wherein she claimed he made untrue representations. He also stated that he pointed out the location of this land on a United States map and told her about the distance the land was from San Antonio, and she admits that he did point out such location on the map. It further appears from one of her witnesses or the State's witnesses that he represented the distance of the land as about ninety miles from San Antonio instead of nine, and she was most likely mistaken about the distance or misunderstood him. He was also corroborated in his statement as to what he said to her about the land by some two or three other witnesses.

There is absolutely no showing in this record that the prosecutrix relied upon the statements made to her by plaintiff in error, either by her own testimony or otherwise, but it affirmatively appears that she made independent investigations of the land and of the conditions in Texas where the land was situated. Neither does it anywhere appear that a confidential relation existed between the prosecutrix and the plaintiff in error, or that any artifice or trick was resorted to to gain her confidence, other than what has already been stated. The prosecutrix positively testified that after Koelling had given her his description of the land she was buying, and after he had made his own representations with reference thereto, and before she had even indicated any intention or disposition to make a trade with him, he introduced her to a family by the name of Tent, who were ready to go down to a similar tract of land purchased, Tent having visited the land and examined it before

he made his purchase. Her testimony then proceeds in the following language: "I went down to see them, [the Tent family,] and they had their things packed ready to go. I thought if they were going down it might be a good thing, so I went down to the bank and drew the money and gave it over to Mr. Koelling." Her contract with Koelling was for the purchase of 13½ acres of land, for which she paid $1666.65. She made payments on October 15 and 20, 1913, a part in cashier's checks and a part in money, and gave three notes, each for $277.77, with six per cent interest, and afterwards paid the three notes before due to save the interest. She received a warranty deed and an abstract of title to the property showing good title in her. There was a further contract entered into between them for the clearing of the land by the company. It appears from the record that a part of this land had already been cleared by another party who had failed to take the land. The additional contract of $300 will be made to appear by a memorandum or bill in the following language:

"Clearing and plowing, at $14 per acre for clearing done. This will include the 13½-acre tract, now partly cleared; the planting of two acres in fig shoots; one acre in cabbage; strawberry beds between fig rows; one-fourth acre of variety of fruit trees, such as grape-fruit, pear, apple, orange and plum; one acre carrots, beets, mangel wurzels, etc. ............................................$274.00
One dozen first-class stock of hens...................... 26.00"

The idea of buying hens to take down to her land originated with her after talking with the Tent family and finding that they were going to take hens down there for the purpose of raising chickens, and she had Koelling buy the chickens at the above price, and he paid that price in cash in Chicago for the hens out of the $300 received from her. By his own testimony, which is undisputed, he remitted the balance of her money to the party in charge of the club house, with directions to have it expended for clearing and planting the land. The evidence further shows that the land

was cleared and about two hundred fig shoots were set out on the land but that all the crops and plants to be planted were not set, and under the evidence it would have been almost useless to have planted the same without irrigation, which she failed to obtain. The evidence further shows that the land actually cost in the original purchase by the land company $42.50 per acre, and with other expenses of deep well, etc., it has cost the company more than $60 per acre. The evidence further shows that in addition to the information gained by the prosecutrix from the Tent family regarding the land she was purchasing she examined the government report of the land and interviewed a number of people besides Tent who had bought land out of the same tract and who had been down there and examined the land before she talked with them, and speaking of these interviews she closes her testimony with this statement: "And I talked with them about the situation in Texas and the kind of land they had down there." The showing from the record is, in fact, that she relied upon the statements and information that she had from other parties and upon her own investigation, and that it was not by any artifice or trick that plaintiff in error gained her confidence and thereby obtained her money. We are not satisfied from the evidence in the record that she was swindled out of her money at all, as the evidence shows almost without question that the land, as represented, is very fertile and by intensified farming will produce two and three and as high as four different garden crops per year, and that similar land very near by has been known to do so, and to have produced six and seven crops of alfalfa per year and from four hundred to five hundred and even one thousand bushels of Bermuda onions, and that the land will produce all kinds of crops grown in the south when properly irrigated, such as cabbage, carrots, beets, lettuce, onions, brussel sprouts, Mexican peppers and most all kinds of southern fruits. Had she

had the land irrigated and planted as contracted for, from what appears in the record she could have raised large crops, as aforesaid, on her land, and the State has not shown by its evidence that the land was not worth the amount of money paid for it by her, and has not shown by the degree of evidence required that it was the fault of plaintiff in error that the contract to clear and plant, which the company made with her through him, was not completed. It is the duty of this court to determine the question whether or not there is a reasonable doubt of the defendant's guilt, and if so, the verdict and judgment of the trial court cannot stand. *People* v. *Wallace,* 279 Ill. 139.

Under the Confidence Game statute the offense consists in gaining the possession of money or property by means of some trick or device or swindling operation in which advantage is taken of the confidence of the victim reposed in the swindler. Obtaining money by false pretenses, under the False Pretense statute, is not enough, when the same is shown, to convict the one so obtaining the money of the confidence game. It is the means by which the property is obtained that distinguishes the two offenses, and the distinctive feature of the Confidence Game statute is not shown by the evidence under which we are asked to affirm this judgment against plaintiff in error. *People* v. *Miller,* 278 Ill. 490.

We find no escape from the conviction that two of the elements constituting the crime charged in this indictment are entirely lacking in this record, and for that reason the judgment of the criminal court will be reversed and the cause remanded.          *Reversed and remanded.*