(No. 13283.—Judgment reversed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAKE SANTOW *et al.* Plaintiffs in Error.

*Opinion filed June 16, 1920.*

1. CRIMINAL LAW—*what necessary to conviction for confidence game.* To justify a conviction for the confidence game the proof must show that by the use of false statements or pretenses the defendants secured the confidence of the complaining witness and as a result of such confidence obtained his money or property.

2. SAME—*when Confidence Game statute does not apply.* The Confidence Game statute does not apply to business transactions between parties dealing with each other on an equal footing even though there is such fraud or misrepresentation as will subject the guilty party to liability in a civil action.

3. SAME—*a swindling operation is not necessarily the confidence game.* There may be swindling in a business transaction without the person who is responsible for the swindling being guilty of operating the confidence game, as a swindling operation does not constitute the confidence game unless the element of confidence becomes a part of the swindle.

WRIT OF ERROR to the Circuit Court of Stephenson county; the Hon. OSCAR E. HEARD, Judge, presiding.

DOUGLAS PATTISON, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, CHARLES H. GREEN, State's Attorney, and GEORGE C. DIXON, for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiffs in error, Jake Santow and M. Weinberg, were indicted, tried and found guilty in the circuit court of Stephenson county of attempting to obtain money by means of the confidence game and were sentenced to the penitentiary. This writ of error was then sued out.

Joe Warsawsky operated a junk business in Freeport, Illinois, under the name Freeport Iron and Metal Company, not incorporated. October 4, 1918, plaintiffs in error came

and loitered about the gate in front of his place of business and after some preliminary conversation they announced to Warsawsky that they were market peddlers at Marengo, Illinois, and also, when that business was dull, peddled junk gathered in and about Marengo; that they had some rags, iron and paper which they would like to sell to Warsawsky, stating that they had been "skinned" or treated badly a couple of times before by dealers in other cities and had been advised by an acquaintance in Chicago that Warsawsky would give them a square deal. Warsawsky offered them $4 a hundred for the rags they claimed they had at Marengo. They left for a brief time and then came back and said they would sell the rags for $4.25 a hundred and the other junk (iron and paper) at the prices originally fixed by Warsawsky. They also said that being poor men they would like to arrange with the purchaser to receive three-quarters of the amount in cash when the bill of lading was presented to Warsawsky for the rags. It was agreed that these rags were to be shipped as directed by Warsawsky, and thereafter one of the plaintiffs in error would bring him the bill of lading and receive three-fourths of the agreed price in cash. The testimony shows that two or three days thereafter one of the plaintiffs in error telephoned to Warsawsky asking where the rags were to be sent and was told to send them to a firm in Chicago, and Santow, who was doing the talking on the telephone, said he would be up on the next train with the bill of lading. In accordance with that statement he went to Freeport the same day and left the bill of lading with Warsawsky. The bill of lading, instead of being for "mixed rags," as the testimony tends to show was the agreement, billed them as "scrap rags." Warsawsky figured up the amount due under the contract and gave Santow a check for three-fourths, or $795.60, which Santow took to the Stephenson County Bank, upon which it was drawn, and indorsed it and obtained in its place a draft on the First National Bank of Chicago. Shortly after Santow

left, Warsawsky, noticing that there was no stencil weight by the railroad company marked on the bill of lading, went to the railroad office to see if it had railroad scales and then went to Marengo the following morning to see the car of rags. He found, according to his testimony, that the car contained "nothing but a lot of mill refuse, soaking wet." He testified that plaintiffs in error told him the rags were gathered in and around Marengo. An employee, Saunders, corroborated his testimony in regard to the conversation at the time the transaction was had and the contract entered into for the purchase of the rags and junk. One Lane, who was with Saunders when the car was opened, testified for the State that they examined the contents of the car and found it was loaded two or three feet high on both sides with "wet, smoky, stringy mill refuse;" that the contents consisted of bales of what was called in the rag business "chop suey;" that "it looked like mill strings,—partly rags and some kind of wood, pieces of paper; it was good and wet, * * * just as it came from the mill waste." Other witnesses testified to the same effect. The assistant agent of the Northwestern railway in Chicago stated that after the car had been received in Chicago its contents were found to be "wet refuse, made up of a whole lot of material," and he was ordered by the railroad authorities to dump the car as they could not get anything for its contents. Some of the witnesses for plaintiffs in error testified they saw the contents of this car; that the rags were mixed scrap rags, having a market value of about three cents a pound; that they were a little damp and that some of the material was mill refuse but not all; that some of it was what might be called "scrap rags." The evidence also tends to show that plaintiffs in error represented at the time these rags were sold that they were country mixed rags, and that country mixed rags are such as are collected by rag-pickers going from house to house in the country districts and included all kinds of rags that would be gathered under such con-

ditions. The weight of the evidence shows that the contents of the car were not country mixed rags but scrap rags, which would be practically worthless in the market.

The evidence shows that this identical car of rags was originally billed from Chicago by the Chicago Metal Refining Company to B. Goodman at Marengo and was receipted for by Santow under the name of J. Steinberg; that he also paid the freight and demurrage on the car; that Santow was the son of one of the owners interested in the original consignor company. A fictitious name was given by plaintiffs in error in receipting for the car, and the same fictitious name was given at the time the rags were sold to Warsawsky. The testimony shows that the plaintiff in error Weinberg at the time of the sale stated to Warsawsky that the other plaintiff in error was his son, and that the reason he was selling everything out was that his boy would soon be called to war,—expected to be called in two or three weeks,—and that he had to get rid of everything before the son went, and he gave his name to Warsawsky as M. Steinberg. The check made by Warsawsky at the time the bill of lading was presented was made to M. Steinberg and likewise the draft that was given by the Stephenson County Bank, and the evidence shows without dispute that the plaintiffs in error gave these same names to other persons with whom they were communicating at or about the time of this transaction, while their names, as shown by the record, are M. Weinberg and Jake Santow, and there is nothing in the record to show that the two plaintiffs in error are in any way related.

Counsel argues that the evidence is entirely consistent with the theory that the transaction was a mere business one, in which both parties were dealing at arm's length on an equal footing; that at the most the only thing the evidence proves is that plaintiffs in error misrepresented their goods and that the evidence fails utterly to show that Warsawsky reposed any confidence in plaintiffs in error or that

293 – 28

either party had any special confidence in the other. In order to find plaintiffs in error guilty of the confidence game as defined by the statute, proof must be made that by the use of false statements, misrepresentations or pretenses they secured the confidence of the complaining witness, and that, having so secured such confidence, they defrauded him or attempted to defraud him of his money. There may be swindling in a business transaction without the person who is responsible for the swindling being guilty of operating the confidence game. A swindling operation does not constitute a confidence game unless the element of confidence becomes a part of such swindling. (*People* v. *Gallowich,* 283 Ill. 360; *Juretich* v. *People,* 223 id. 484.) In the case at bar there is little, if any, proof tending to show any misrepresentation made by the plaintiffs in error to the complaining witness except as to their names and that one of them was the son of the other. The history of the entire transaction tends strongly to show that the plaintiffs in error and the complaining witness were dealing at arm's length and on equal footing. There is no evidence tending to show that because of false representations or any swindling operation the complaining witness had been induced to repose confidence in the plaintiffs in error. The statute relating to the confidence game does not apply to business transactions between parties dealing with each other on equal footing. (*People* v. *Turpin,* 233 Ill. 452.) To justify a conviction on an indictment for the confidence game it is not sufficient to prove the defendant guilty of such acts and fraudulent practices, only, as would subject him to liability in a civil action. (*Dorr* v. *People,* 228 Ill. 216.) Under the proper construction of the Confidence Game statute as heretofore construed by this court, it cannot be held that the plaintiffs in error were guilty of the confidence game.

This conclusion makes it unnecessary to consider or decide certain other questions raised in the case. We deem it proper, however, to state that under the reasoning of this

court in *People* v. *Jordan,* 292 Ill. 514, the third instruction given on behalf of the People must be held erroneous.

The circuit court erred in not setting aside the verdict for want of sufficient evidence. The judgment of that court is therefore reversed.                    *Judgment reversed.*