THE STATE OF MONTANA, Plaintiff and Respondent, v. A. F. ALLEN, Defendant and Appellant.

No. 9376.
Submitted May 18, 1954. Decided October 11, 1954.
275 Pac. (2d) 200.

Mr. Jerry J. O'Connell, Messrs. O'Connell & Daly, Great Falls. for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Ted James, County Attorney, Mr. Orville F. Gray, Mr. Marvin J. Smith, Deputy County Attys., Great Falls, for respondent.

Mr. O'Connell, Mr. Gene B. Daly and Mr. Smith argued orally.

MR. JUSTICE FREEBOURN:

Defendant, charged by information, with a felony—obtaining personal property by means of artifice or pretense, commonly called confidence game or bunco—was upon trial convicted by a jury. From the judgment of conviction defendant appeals.

The information charges that defendant "did commit the crime of obtaining money by artifice or pretense, in this, to-wit: That said defendant * * * did obtain from one Elsie Dibble certain personal property, to-wit: a diamond ring of a value in excess of fifty dollars * * * by means of artifice or pretense, commonly called confidence game or bunco."

The information is drawn under R. C. M. 1947, sec. 94-1806, which provides: "Confidence games. *Every person who obtains* or attempts to obtain from another any money or *property,* by means or use of brace faro, or any false or worthless checks, or *by any other means, artifice, device, instrument or pretense, commonly called confidence games or bunco,* is punishable by imprisonment in the state prison not exceeding ten years." Emphasis supplied.

The wording of section 94-1806, supra, viz., "by any other means, artifice, device, instrument or pretense, commonly called confidence games or bunco," limits the words "by artifice or pretense" as used in the information to "confidence games or bunco." In other words, in order to convict the defendant of the crime charged, the prosecution had to prove by satisfactory evidence and beyond a reasonable doubt that defendant secured the ring from the complaining witness by means of a confidence or bunco game.

A defendant can be convicted only of the offense charged in the information.

In State v. Gaimos, 53 Mont. 118, 162 Pac. 596, 599, this court

said: "The information can, however, charge but one offense (Rev. Codes, sec. 9151 [1907, now R. C. M. 1947, sec. 94-6407]), and the defendant can be convicted only of the offense charged. The state cannot prove two or more offenses as such and then select any one of them as the one for which a conviction will be sought. * * * and it necessarily precludes the notion that a conviction can be had for any act other than the one intended from the beginning to be charged."

In State v. Sauter, 125 Mont. 109, 232 Pac. (2d) 731, 734, we said: "An information can charge but one offense. R. C. M. 1947, sec. 94-6407. It naturally follows that a defendant can be tried for and convicted of but one offense, that charged in the information. State v. Gaimos, supra."

And again in State v. Smith, 57 Mont. 563, 190 Pac. 107, 114, we said: "An information must charge but one offense, and the accused can be convicted only on the offense so charged."

A defendant charged under section 94-1806, supra, with obtaining property by means of a confidence or bunco game, cannot be convicted on evidence which shows that defendant obtained such property "by false or fraudulent representation or pretenses", R. C. M. 1947, sec. 94-1805, because such crimes, as defined in the above two sections, 94-1805 and 94-1806, are separate and distinct offenses.

In State v. Moran, 56 Mont. 94, 182 Pac. 110, 114, a confidence game case, when this court consisted of three justices, Chief Justice Brantly and Associate Justices Holloway and Cooper, it was said: "I [Brantly] concur in the result, though I think, with Mr. Justice Holloway, Mr. Justice Cooper [the writer of the opinion] fails to distinguish clearly the crime of practicing a confidence game from that of obtaining money or property by means of a false and fraudulent pretense. The two crimes are wholly distinct. Rev. Codes, secs. 8683, 8684 [now R. C. M. 1947, secs. 94-1805, 94-1806].

"I [Holloway] agree with the result reached, but not with all that is said in the opinion. Much of the discussion is more appropriate to a consideration of the crime of obtaining money

by false pretenses, defined by section 8683, Revised Codes [1907, now R. C. M. 1947, sec. 94-1805]. Obtaining money by means of a confidence game is a distinct offense condemned by section 8684 [Revised Codes, 1907, now R. C. M. 1947, sec. 94-1806].

"There is evidence in the record, in addition to that stated above, which, with the evidence narrated, is sufficient in my opinion, to establish the guilt of defendant Burke."

"R. C. M. 1947, sec. 94-1805, provides: "Obtaining money or property by false pretenses. *Every person who knowingly and designedly, by false or fraudulent representation or pretenses, defrauds any other person of money or property,* including evidence of indebtedness, or who causes or procures others to report falsely of his wealth or mercantile character, and by thus imposing upon any person obtains credit, and thereby fraudulently gets into possession of money or property, is punishable in the same manner and to the same extent as for larceny of the money or property so obtained."

Section 94-1806, supra, under which defendant was charged, provides three ways in which the crime of securing property by means of a confidence game can be committed: (1) "by means or use of brace faro"; that is by showing that during the playing of faro, a game played with a dealer, a box, 52 playing cards, and a layout, the case-keeper collusively marks up cards surreptitiously taken from the dealing box by the dealer, so that in the game one or more participants are swindled (see Merriam-Webster's New International Dictionary, 2d Edition); (2) "by means or use of * * * any false or worthless checks"; (3) "by any other means, artifice, device, instrument or pretense, commonly called confidence games or bunco".

We need not further consider methods of obtaining of money or property by means (1) of a crooked faro game, or (2) by a false check, except to say that their inclusion in this section indicates an intent on the part of the lawmakers to make something more than mere words necessary to a conviction under this section.

Section 94-1806 was enacted at a time, 1895, when men, as

now, thought up and practiced methods, as devious as the winds, in order to obtain money and property from the innocent and unwary. Common it was, at the time, to read in the newspapers how some New York slicker had sold the Brooklyn bridge or the city hall to some up-state "hayseed," a wisp of timothy hay between his teeth, a telescope valise or carpet bag in one hand, while the other hand pressed the pocket, filled with long green. About the same time the Iowa "Jay" with hog dust on his shoes and corn silk behind his ears, was buying a "gold brick" from a Chicago slicker.

The city slicker did more than gain the confidence of his victim and make false statements to him; he showed him the Brooklyn bridge and the gold brick. This constituted a part or step in the confidence or bunco game.

In the more recent past, one of the common confidence games practiced is that of matching coins.

Butte, Montana, once a town where one could win or lose on the square, has apparently fallen victim to this coin matching game. In the July 19, 1954, issue of the Montana Standard, a Butte morning newspaper, appeared an item describing how a Long Beach, California, youth "was taken for $75 in a coin matching game at the Union Bus depot;" while a man from Montgomery, Alabama, had just three days before been taken for $100 by the same method at Park and Dakota streets," which is one block from the bus depot.

In State v. Moran, supra, the complaining witness with money in his pocket to be used in farming, was seated on a city park bench in Great Falls, Montana. Moran came up and sat down beside him, starting a conversation with the complaining witness, during which the victim told Moran of his intention to start in farming Moran said he had a brother who was farming near Edmonton, Alberta, Canada, and he would write his brother about conditions there. They, by arrangement, met on the following Monday and they started for the post office to see if the letter from Moran's brother, describing conditions, had arrived.

Near the Western Union office they overtook Burke and Moran said, "Hello there, Spokane", to which Burke replied, "Guess you are mistaken in your man." The three started on, Burke going into the building in which the Western Union office was. Later Burke caught up with Moran and the victim and asked Moran to explain where they had met, and Moran went on to tell he had seen Burke in Spokane with a " 'big roll of bills' in his hands". Moran went on to say that later he had seen Burke's picture in a Spokane paper which told how Burke had "cleaned up $80,000" from Seattle pool rooms.

Burke then said, "You boys are not spotters or detectives, are you?" Moran and the victim said they were not, and Burke then said, "I am working here for a Breeders' Association of New York, placing some money on some horses. We are trying to break up some exchanges that are carrying on in the different cities." Moran asked, "Can't you do a little something for us?" Whereupon Burke pulled out some bills from his pocket and gave them to Moran, who said, "No, I didn't mean it that way". Moran then handed Burke a dollar, saying, "Can't you get us a little cigar money? Place it on the races?" Burke took the dollar, saying, "Go up the street a few blocks and I will meet you later on."

Burke disappeared and came back later, giving Moran $2. Following this Burke went on to describe his work in connection with placing bets on the horse races, showing the victim what purported to be a letter from a bonding company, notifying Burke his bond in the amount of $30,000 for the faithful performance by him of his alleged contract with the Breeders' Association of New York had been accepted. He showed the victim another letter and a paper which purported to be a code of the association indicating a winning horse for that day.

Asked by Burke if they wanted to place a bet on the horse indicated, Moran and the victim each gave Burke $5. Burke left ostensibly to place the bet, but before going described how he had won a large sum of money betting on a horse race for a friend, a bank employee in Salt Lake City, who was short in

his accounts. Later Burke returned and gave Moran a twenty dollar bill, telling Moran to give the victim half of the twenty, and Moran gave the victim ten dollars.

Moran suggested that they bet some more, and Burke sent Moran uptown to see if any message had arrived. Moran returned with a message, which was in code, and named a horse supposed to win. Told by Burke that the transaction was legitimate, the victim gave Burke four traveler's checks for $10 each, one for $20, and a $10 bill, who said he hated to make such a small bet and suggested Moran and the victim put up $1,000 each. The victim said he had no more money and after more talk and a pretense on Burke's part of going down to some "exchange" it finally dawned on the victim that he had been taken to the extent of his $70.

There is no question but what there was plenty of evidence to show the victim's money was obtained through a confidence or bunco game, and that is why Chief Justice Brantly and Associate Justice Holloway concurred in the conclusion reached by Associate Justice Cooper that ''the conviction of defendant Burke is sustained by the evidence and should be affirmed.

''As to Moran: Had the prosecution negatived the existence of a pool room in the city of Great Falls, and the genuineness of the message purporting to have been obtained from the Western Union telegraph office—the telegram upon which Adair acted in entrusting his money to Burke—we might have reached a different result. In the absence of this proof, however, we are of the opinion that the evidence is not sufficient to establish beyond a reasonable doubt that Moran was the confederate of defendant Burke, and therefore as to him the judgment should be reversed * * *.''

It is also apparent that Chief Justice Brantly and Associate Justice Holloway felt that Associate Justice Cooper was quoting law which was applicable to a crime of obtaining money or property by false or fraudulent representations or pretenses but not applicable when such money or property was obtained by means of a confidence or bunco game.

In Wheeler v. People, 49 Colo. 402, 113 Pac. 312, 314, Ann. Cas. 1912A, 755, the Colorado Supreme Court said: "To constitute the offense, with the commission of which defendant was charged, tried, and convicted, the 'money or property must have been obtained by means of, or by the use of brace faro, or any false or bogus checks, or by any other means, instrument or device, commonly called confidence games.' Section 1332, Mills' Ann. St. * * * To constitute the offense, the money or property must have been obtained, or the attempt thereto made, by means of some false or bogus means, token, symbol, or device, as distinguished from mere words, however false and fraudulent. The act of obtaining money, goods, or anything of value by false pretenses is made criminal by section 1379, Mills' Ann. St., and it would therefore seem that, to constitute the crime implied in, and covered by, the words 'confidence games,' the 'swindling operation' must necessarily include something other than mere words.

"Maxwell v. People, 158 Ill. 248, 41 N. E. 995 states that it is difficult to give a definition of what is commonly called the confidence game, and quotes from Morton v. People, 47 Ill. 468, to the effect that the 'devices' entering into and constituting the confidence game are 'as various as the mind of man is suggestive,' and holds that 'the obtaining of money by means or use of what is false or bogus is the offense aimed at,' and its essential ingredient is a swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler. In the Maxwell Case 'false representation and encouragement' was united with a trick at cards to induce the prosecuting witness to part with his money, and it was held that the elements of false representation and encouragement were mingled with the trick of the cards in such a way as to gain the confidence of the victim, and throw him off his guard, and 'together constituted the swindling operation.' In Pierce v. People, 81 Ill. 98, in considering the legislative act on the subject, which is identical with ours, it is held that obtaining credit by false representations in regard to the party's solvency is not within the contemplation

of the statute, that the language of the statute does not expressly extend to cases of money or property obtained on the belief of ability and disposition of the party to thereafter make payment; but it contemplates a transaction in which the 'means or device, instead of being the cause of the cause, is the direct or proximate cause of obtaining the money or property, and, being a highly penal statute, we are not authorized to extend its meaning by implication.'

"It may be defendant acted fraudulently, but every fraud is not a 'confidence game.' Obtaining money by loans or advancements, by false representations in regard to her solvency, or ability, or purpose to make profitable investments and return large profits—even if such effect could be properly ascribed to defendant's acts—is not within the contemplation of the statute under which she was prosecuted."

The complaining witness here, a widow, met defendant, a widower, about June 1, 1953, when he engaged her granddaughter to do telephone soliciting for him.

About June 20th the complaining witness "just casually said I would be interested in oil, would like to have oil."

"Q. You said that? A. I said it.

"Q. Not Mr. Allen? A. Well, I said it and then he immediately grabbed it up.

"Q. You were interested in oil, yes, and that is how the discussion started? A. That's right.

"Q. And so he told you he had oil wells in Louisiana? A. That's right.

"Q. And he said he had an oil well there that was bringing him in $800.00 a month? A. That's right.

"Q. Did you show any interest in that? Did you express any interest? A. Well, he said it made his income tax very high to have that much oil, and he said he would be very glad to let me have two hundred of it, and so I said I didn't have any money to put into oil at the present, but I did have a ring, and he said—

"Q. And he first said, before you told him you would give

him the ring he first said he would cut you in for $200.00, is that right? A. That is the way I understood it.

"Q. And just you and he were there? A. That's right.

"Q. Now, you gave him the ring and then in addition you said you gave him twenty dollars for a fee? A. That's right.

"Q. Now, your testimony is that right after you gave him the ring you walked out in the yard and you were pretty leery about it? A. I was, very much so.

"Q. Now, I think you testified that he didn't talk about himself too much, just said he was a widower and he didn't try to show any credentials? A. No, he didn't show me any credentials whatever.

"Q. No papers of any kind? A. No.

"Q. Or anything of that kind? A. No.

"Q. He didn't try to show you any stock in a Louisiana oil well? A. No.

"Q. Didn't he try to show you anything in connection with this so-called Louisiana oil well? A. No.

"Q. None at all? A. No.

"Q. Now, your best recollection is that you gave him the ring on the 20th of June? A. The 7th or 8th of July.

"Q. And when were you supposed to get the first $200.00 a month? A. The 15th of July.

"Q. You thought it was very risky, this deal? A. That's right.

"Q. And then I think under your direct examination you said, 'In a way I didn't believe him.' What did you mean by saying 'In a way I didn't believe him?' A. Well, I was afraid.

"Q. You were afraid? A. He was crooked.

"Q. You were afraid he was crooked? A. That's right.

"Q. So that you didn't rely on his statement at all? A. Not too much.

"Q. As a matter of fact, you were just taking a chance, isn't that right? A. Yes.

"Q. You just decided to take the chance even though you

were suspicious and didn't trust him, is that right? A. I guess so.
"Q. Is the answer 'Yes'? A. Yes."

Taking the testimony of the prosecuting witness for what it ▮▮ is worth, one can well question whether or not she, when she gave defendant the ring, did so because she had confidence in him. Granting, however, that she did have such confidence, all that defendant did, to induce here to give him the ring, was, after she had broached the subject of oil wells, to say, in effect that he had an oil well in Louisiana from which he received $800 a month income, and that he would cut her in for $200 of that income. The jury could assume such statements were false, since, according to the complaining witness, neither the first $200, due July 15th, nor any other was ever paid to her.

Defendant should have been prosecuted under R. C. M. 1947, sec. 94-1805, "obtaining money or property by false pretenses", not under R. C. M. 1947, sec. 94-1806, "confidence games."

Confronted with this situation we cannot, as many other courts have apparently done in order to sustain a conviction, "whittle" down the requirements of the confidence game statute, so that a defendant, charged under such statute, can be convicted by evidence meeting only the requirements of the false pretense statute.

The effect of the decision of Associate Justice Cooper in State v. Moran, supra, if concurred in by the other two justices, would have made this court one of the "whittlers." The specially concurring opinions of Chief Justice Brantly and Associate Justice Holloway prevented this, and pointed out the path for us to follow.

If the evidence upon which defendant was convicted here is sufficient to sustain a conviction for the offense of obtaining property by means of a confidence game, section 94-1806, supra, then there is no difference between such offense and the offense of obtaining property by false pretenses, section 94-1805, supra, and such offenses are not separate and distinct crimes.

Defendant's motion made at the close of the state's case, "that

the court instruct the jury to bring in a verdict of not guilty" should have been granted. See R. C. M. 1947, sec. 94-7227.

For the reasons stated the judgment of the lower court is reversed and the cause remanded with directions to dismiss the information.

MR. JUSTICES BOTTOMLY and ANDERSON concur.

MR. CHIEF JUSTICE ADAIR:

I dissent.

The information herein is good. It charges but a single offense. The charge is that on a day certain at Cascade County, Montana, the defendant obtained from Elsie Dibbler her diamond ring of a value in excess of fifty dollars "by means of artifice or pretense commonly called confidence game." In other words defendant was accused of swindling the prosecutrix out of her valuable ring by means of artifice and pretense constituting a confidence game.

The legislative assembly of this state, by valid enactment, made it a crime punishable by imprisonment in the state prison to so obtain property from another by means of a "confidence game." R. C. M. 1947, sec. 94-1806.

A jury heard the evidence in the case and found the defendant guilty of the one crime charged in the information. A judgment of conviction was entered on the jury's verdict and, in my opinion, the evidence amply sustains same.

As was said in People v. Westrup, 372 Ill. 517, 25 N. E. (2d) 16, 18: "The fact that the transaction was made to assume the form of a business deal is not material, if in fact, it was a swindling operation [citing cases], which the evidence clearly shows that it was." Also see Rucker v. State, 88 Okl. Cr. 15, 195 Pac. (2d) 299, 311, 199 Pac. (2d) 221.

In McBride v. People, 126 Colo. 277, 248 Pac. (2d) 725, 728, the court said: "The essence of the offense is the plan and purpose of the perpetrator to swindle another of his money or property. To swindle is to trick and cheat another of his pos-

sessions by falsehood, cunning or conniving scheme. ' "Confidence game is any swindling operation in which advantage is taken of a confidence reposed by the victim in the swindler." ' Lace v. People, 43 Colo. 199, 204, 95 Pac. 302, 304. Any plan or scheme of trickery wherein any false token or thing is made use of to accomplish the intended result constitutes a 'confidence game.' No single definition can cover the range of possibilities of this offense, for they are as ' "various as the mind of man is suggestive." ' Kelly v. People, 121 Colo. 243, 251, 252, 215 Pac. (2d) 336, 340, citing with approval in this connection, Powers v. People, 53 Colo. 43, 123 Pac. 642; Elliott v. People, 56 Colo. 236, 138 Pac. 39; Peiffer v. People, 106 Colo. 533, 107 Pac. (2d) 799. Each instance depends upon its own peculiar facts and circumstances. The gravamen of the offense is not so much by what *means* was the victim filched, but the *intent* of the perpetrator in effecting his unrighteous objective."

In People v. Priola, 395 Ill. 296, 70 N. E. (2d) 46, 48, it is said: "The first contention is that the offense shown to have been committed was not a confidence game, but only larceny. We have held many times that the gist of obtaining money by the use and means of the confidence game is the confidence which one person inspires in another, with the result of obtaining money. It covers any swindling scheme whereby the swindler wins the confidence of his victim, and by reason thereof takes his money from him. People v. Marmon, 389 Ill. 19, 58 N. E. (2d) 603. It may be another crime was committed, but that does not prevent prosecution of defendants for obtaining money by the confidence game, as the same act may constitute two or more offenses. Nagel v. People, 229 Ill. 598, 82 N. E. 315; People v. Singer, 288 Ill. 113, 123 N. E. 327. The offense was complete when they received the money from Mrs. Koll through her confidence in them." Compare: State v. Kavanaugh, 203 La. 1, 13 So. (2d) 366, 371; People v. Mutchler, 309 Ill. 207, 140 N. E. 820, 35 A. L. R. 339; People v. Rosenbaum, 312 Ill. 330, 143 N. E. 859.

The judgment of conviction entered on the jury's verdict should be affirmed.

MR. JUSTICE ANGSTMAN: (dissenting).

It is true, as the majority opinion holds, that the confidence game statute covers a crime different from that of obtaining money by false pretenses under section 94-1805, supra. On at least that point a majority of the justices agreed in the case of State v. Moran, 56 Mont. 94, 182 Pac. 110.

The distinction between the two crimes is shadowy and I shall not attempt to point out where one ends and the other begins.

The gist of the crime denounced by R. C. M. 1947, sec. 94-1806, is the obtaining of property through or by means of obtaining the confidence of the victim through false representation or device.

The Supreme Court of Illinois has stated certain distinguishing features between the two crimes as established by prior decisions, many of which are relied on in the Moran case, supra, in the late case of People v. Gould, 363 Ill. 348, 2 N. E. (2d) 324, 326, as follows: "There is a difference between the crime of confidence game and that of obtaining money or property by false pretenses. On account of the multitude and diversity of means employed to fraudulently obtain the confidence of a victim, the term 'confidence game' can hardly be defined in a manner that will cover and segregate all cases of that nature from those constituting the offense of obtaining money or property by false pretenses. Obviously, false pretenses of some sort are employed in a confidence game. The crimes are separate and distinct and are differentiated by the facts and circumstances of the transactions. The difference between the two offenses may be found in the many expressions of this court where the question has been at issue. By those cases it is well established that any designed misrepresentation of an existing fact or condition by which a party obtains the money or goods of another is a false pretense under the statute (Smith-Hurd Ann. St. c. 38, sec. 253), making it a crime to obtain money or property by

false pretenses. People v. Peers, 307 Ill. 539, 139 N. E. 13; Jackson v. People, 126 Ill. 139, 18 N. E. 286. The confidence game statute (Smith-Hurd Ann. St. c. 38, sec. 256) was designed to reach that class of offenders known as confidence men, who practice upon unwary victims swindling schemes as various as the mind of man is suggestive. As the name of the crime implies, the gist of it is the obtaining of the confidence of the victim by some false representation or device. People v. Snyder, 327 Ill. 402, 158 N. E. 677, 56 A. L. R. 722; People v. Parker, 356 Ill. 138, 190 N. E. 318; People v. Heinsius, 319 Ill. 168, 149 N. E. 783; People v. Harrington, 310 Ill. 613, 142 N. E. 246; People v. Peers, supra; People v. Santow, 293 Ill. 430, 127 N. E. 671, 9 A. L. R. 1524. A swindling operation which is not connected with the element of confidence fraudulently obtained for the purpose of the swindle does not constitute the crime of confidence game. People v. Peers, supra; People v. Rallo, 293 Ill. 304, 127 N. E. 715; People v. Santow, supra. It is not enough to show that money or property was obtained by false pretenses. People v. Peers, supra; People v. Koelling, 284 Ill. 118, 119 N. E. 993. It is well settled that, in order to constitute the crime of confidence game, it is necessary that there be more than confidence reposed in the swindler. Where the confidence of the injured party is honestly obtained through a course of regular business dealings and the one in whom the confidence is reposed breaches that confidence to the injury of the one reposing it, the statute defining and punishing the confidence game is not violated. People v. Snyder, supra; People v. Benton, 324 Ill. 331, 155 N. E. 308, 56 A. L. R. 725; People v. Perlmutter, 306 Ill. 495, 138 N. E. 152. Where the property is obtained by unlawful means other than by fraudulently obtaining the confidence of the victim and abusing the confidence so obtained, a conviction for the crime of confidence game cannot stand. People v. Snyder, supra; People v. Benton, supra; People v. Perlmutter, supra. Where the property is obtained by unlawful means other than by fraudulently obtaining the confidence of the victim and abusing the confidence so obtained, a conviction for the crime of confidence

game is not warranted. People v. Snyder, supra; People v. Ingravallo, 309 Ill. 498, 141 N. E. 176; People v. Koelling, supra; People v. Gallowich, 283 Ill. 360, 119 N. E. 283. Expressions may be found in some opinions of this court indicating that the crime of confidence game is established by proving, merely, the obtaining of money or property by a swindling scheme, but, whenever the issue as to the difference between the two crimes has been clearly presented, we have adhered to the principles announced here." To the same effect is People v. Martin, 372 Ill. 484, 24 N. E. (2d) 380.

Chief Justice Stone dissented in the Gould case. He took the view that the confidence game statute is violated even though the confidence was honestly obtained through a course of regular business dealing. It is unnecessary here to choose between these two views because in this case there had not been a course of regular business dealing between defendant and the victim of the alleged swindle.

That the confidence game statute may be violated when the confidence of the victim is obtained through false representation, as well as other token, device or trick, is the general rule elsewhere. Clark v. State, 53 Ariz. 416, 89 Pac. (2d) 1077; State v. Wilson, 223 Mo. 156, 122 S. W. 701. 22 Am. Jur., False Pretenses, sec. 74, p. 483; and compare Elliott v. People, 56 Colo. 236, 138 Pac. 39, although there is authority to the contrary, Wheeler v. People, 49 Colo. 402, 113 Pac. 312.

The evidence introduced by the state shows in substance the following: Mrs. Dibble, a widow 68 years of age, who lives in Great Falls, Montana, with two grandchildren, answered a newspaper advertisement in the latter part of May 1953 by letter. The advertisement sought the services of a woman to do house telephoning. Mrs. Dibble was seeking the employment for her elder granddaughter. In response to her letter defendant came to her house to interview her. He told her the employment consisted of telephoning and "that it was for an encyclopedia and child welfare." Mrs. Dibble explained that it was her granddaughter who was to do the work and he stated that was "per-

fectly all right." After the granddaughter started work, defendant would return to the home about every two weeks to "pick up these cards that she was filling in with the names that she got from phoning." The cards would contain information which was elicited from those called over the telephone. Defendant advised that the telephoning should start from the back of the telephone directory. The only thing said about pay was that defendant said, "We pay good."

Asked if defendant on those visits represented himself as being engaged in any other type of occupation, Mrs. Dibble replied, "Yes, he said he had Louisiana oil; he had wells producing in Louisiana." This was around the 20th of June. He said his Louisiana oil was "very good, very productive, and that he was getting $800 a month from it, and he said he would only be too glad to let me have two hundred." Mrs. Dibble then testified:

"Q. Did he tell you why he would let you have $200.00? A. Well, because it made him too big an income tax; it would cut down his income tax.

"Q. Did he ask you if you had any money to give in exchange? A. And then he asked me if I had any money, and I said, 'No, I didn't but,' I said, 'I do have a diamond ring,' and I said, 'You could use that, that would be all right with me.'

"Q. And what did he say then? A. Well, he said that was all right. He was happy enough to do that.

"Q. And you say he said he would take the diamond ring, and in exchange for the diamond ring you would receive $200.00 a month for the rest of your life? A. That's right, the 15th of each month, $200 a month, the 15th of each month. It was $500 and then a twenty dollar filing fee."

She testified that he claimed, and she paid $20 as a filing fee although there were no papers or anything given. She received no receipt for the $20 or for the ring. Defendant requested that she tell no one about it, that it was all confidential. She believed his story about the Louisiana oil because "he

dressed nice and he had a good car and I kind of supposed he probably did have that much."

No one else was present when this discussion took place. The first payment which she was to receive was to be paid on July 15th. Defendant did not present her with the $200 on July 15th and in fact ceased to make his usual call at the Dibble home, and Mrs. Dibble began to feel uneasy about the situation and about July 20th reported the matter to the police station.

Asked whether anything was said about other property which she had when they had the conversation about the oil, Mrs. Dibble said, "Yes, I spoke about a home which I have in Washington near Tacoma, and he suggested I sell that and put it into oil with him, because it was productive; it was so valuable."

Defendant never contacted Mrs. Dibble after she gave him the ring until September when she saw him in jail.

On cross-examination Mrs. Dibble said she told the defendant the ring was valued at $450, "but he was going to be good to me and be a good fellow and he said I could have five hundred in oil rights." She further testified on cross-examination:

"Q. Now, after Mr. Allen took the ring from you, did he come back to your place again? A. I think he was at the house about two times, checking up or picking up the things, the cards that Claudia [the granddaughter] had gotten ready.

"Q. After he took the ring? A. That's right.

"Q. Now, your testimony is that right after you gave him the ring you walked out in the yard and you were pretty 'leery' about it, A. I was very much so.

"Q. And those two times that Mr. Allen returned did you ask him anything—A. No, I just kept still. It was supposed to be confidential."

On redirect examination she said the first time she became "leery" of Mr. Allen was after he got the ring and had left her place. Mrs. Dibble did not receive the $200 per month promised to her.

This evidence was sufficient to justify submission of the case to the jury on the issues involved, viz., on whether defendant

thus gained the confidence of Mrs. Dibble by the use of false pretenses and representations and by this means obtained from her the diamond ring and $20 in cash, contrary to R. C. M. 1947, sec. 94-1806.

Defendant contends that the evidence shows that Mrs. Dibble did not rely upon the representations made by defendant and hence was not misled by them since she testified that she was "leery" of defendant after she gave him the ring and the $20.

The record shows that she did not become suspicious of defendant or mistrust him until after she had parted with her property and after defendant had left with her property.

Defendant relies on R. C. M. 1947, sec. 94-7219, which requires two witnesses—or one witness and corroborating circumstances—to warrant a conviction for obtaining property with intent to cheat or defraud by false pretenses. That section applies to prosecutions under R. C. M. 1947, sec. 94-1805, and not to prosecutions under the confidence game statute, sec. 94-1806. But were the court to hold that it did apply to the latter, there are in this case corroborating circumstances in addition to the testimony of Mrs. Dibble to make out a case for the jury.

Complaint is made of the giving of certain instructions offered by the state and objected to by defendant. In general the instructions complained of were to the effect that a false pretense under R. C. M. 1947, sec. 94-1806, may be made by representation or statement or by the mere use of words and that a confidence game is any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler. These instructions are in line with the principles of law applicable as above pointed out. The instructions offered by defendant and which were refused were to the effect that no conviction could be had where the false pretense consisted of language unaccompanied by a false token or writing or unless proven by two witnesses or one witness and corroborating circumstances. As above noted, those were not correct statements of the law applicable; hence were properly refused.

Finding no reversible error in the record, I think the judgment should be affirmed.